D. Maimon Kirschenbaum
Lucas C. Buzzard
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, NY 10004
(212) 688-5640
(212) 688-2548 (fax)

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------x

**PAMELA WIMBISH and PATRICIA ONKEN,**

                    **Plaintiffs,**

                  **v.**

**IBM, INC.,**

                    **Defendant.**

-----------------------------------------------------x

**Index No.: 23 CV 08327**

<u>**AMENDED COMPLAINT**</u>

**DEMAND FOR JURY TRIAL**

Plaintiffs Pamela Wimbish and Patricia Onken allege as follows:

<u>**INTRODUCTION**</u>

1.      For the past decade, IBM has been embroiled in age discrimination lawsuits driven by allegations of pervasive discriminatory hiring and firing practices.

2.      In January 2022, in the wake of years of publicly scorned court battles, arbitration proceedings, and costly settlements, IBM CEO Arvind Krishna, announced that he had no more plans to execute major layoffs at the Company.

3.      However, just one year later, Mr. Krishna has announced that IBM intends to replace thousands of employees with AI technology, particularly in IBM's human resources ("HR") organization.

4.      Rather than laying off its weakest, least experienced or least knowledgeable HR employees, IBM has disproportionately terminated its older employees despite their high levels of performance. IBM deems its older employees as having short professional "runways," but it also assumes they are averse to new technology – even as some of their oldest employees have played essential roles in keeping the Company at the forefront of the technology market.

## JURISDICTION AND VENUE

5.      Plaintiff Pamela Wimbish and Plaintiff Patricia Onken bring this action against Defendant alleging discrimination and retaliation claims brought under the Age Discrimination in Employment Act of 1967 ("ADEA"); the New York Administrative Code §§ 8-107(1), et al. ("NYSHRL"), and Article V of the Atlanta Code of Ordinances §§ 94-110, et al. ("Atlanta Fair Private Employment Act").

6.      This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq*. This Court has supplemental jurisdiction over the New York state and Atlanta city law claims, as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

7.      Venue is proper in this District because Defendant conducts business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## THE PARTIES

8.      Defendant IBM, Inc. is a New York corporation with offices worldwide, including offices in New York and Georgia ("IBM" or the "Company"). IBM is headquartered in Armonk, New York.

9.      Plaintiff Pamela Wimbish ("Plaintiff Wimbish" or "Wimbish") is a New York resident who worked for Defendant for 20 years in a broad range of human resources capacities. Plaintiff began her employment with IBM on August 11, 2003 and was unlawfully terminated on April 4, 2023. Wimbish is 62 years old.

10.     Plaintiff Patricia Onken ("Plaintiff Onken" or "Onken) is a Georgia resident who worked for Defendant for over 40 years in a broad range of business, management and human resources capacities. Plaintiff Onken began her employment with IBM in 1981  and was unlawfully terminated on May 4, 2023. Onken is 66 years old.

11.     Plaintiff Onken and Plaintiff Wimbish each filed a charge with the Equal Employment Opportunity Commission on June 26, 2023, which is more than 60 days prior to the filing of this complaint.

**BACKGROUND FACTS – ONKEN**

12.     Plaintiff Onken joined IBM in 1981 as a computer programmer. Onken remained in technical and tech management roles until she became a Call Center Sales Executive in IBM's Atlanta, Georgia office in 1997.

13.     In that role, Onken was a second-line manager of over 100 sales employees spanning nine brands within IBM.

14.     In 1999 Plaintiff Onken became a Program Executive for Worldwide Call Centers, expanding her management responsibilities to a global level. In that role Onken helped IBM

develop the strategy that would allow the Company to effectively transition from the face-to-face sales methods it used historically to phone-based sales in 34 call centers throughout the country.

15.    Onken was highly successful in this position and continued to advance into increasingly more responsible positons within IBM.

16.    Although Onken had been managing employees for years, in 2003, IBM promoted Onken to her first human resources ("HR") role as a Finance and Business Operations Manager for Corporate Learning.

17.    In that role, Onken reported to IBM's Global Chief Learning Officer and managed the financial component of IBM's corporate learning strategies. Onken also worked with IBM's technical organizations to identify the kinds of education IBM employees required to grow and propel the Company forward as a technology leader. Onken received IBM's top performance rating of "PBC1" consistently for four years while in this role.

18.    In 2008, IBM promoted Onken again to the role of HR Strategic Business Partner. In that role she worked with over 100 of IBM's managers and executives from across the Company's four business units – Consulting, Sales, Finance, and Software. Onken helped these managers and executives with all manner of HR needs, including developing human resource budgets, setting compensation trajectories, and facilitating layoffs. Onken held that role for five years, and she received stellar performance reviews throughout that time.

19.    In or about 2013, Onken became the HR Location Leader for Atlanta and an HR Manager. As the HR Location Leader, Onken was expected to be physically present in IBM's Atlanta office every day and to be part of the on-location crisis management team.

20.    Though she was on-site in Atlanta, Onken was also responsible for creating and implementing crisis plans for IBM's offices in ten other states.

21.     As an HR Manager, Onken managed between eight and 28 Strategic HR Business Partners, each of whom supported 100 or more IBM employees. Onken also supported two of IBM's key executives – one of whom managed a 500-employee organization and another who managed a group of over 100 employees.

22.     As an HR Manager, Onken met weekly with the HR Business Partners she supervised to keep them informed about IBM's frequently changing HR policies and practices and to discuss the challenges the Business Partners were facing in their work.

23.     Onken was one of five HR Managers that supervised IBM's HR Strategic Business Partners throughout the United States. Plaintiff Onken was responsible for managing the Strategic Business Partners in the Consulting organization, while her four counterparts supervised HR Strategic Business Partners in the Software, Technology and Sales sectors. Three of the HR Managers, including Onken, were in their 60s, and two were in their 50s when Plaintiff Onken joined the group.

24.     When one of the HR Managers in her 50s resigned, IBM chose Onken to take on her work with the Software organization's HR employees.

25.     In or about 2020, a 38-year-old woman named Dina McDonald became Onken's manager. Ms. McDonald rarely met with Onken or her four counterparts.

26.     When the oldest of Onken's HR Manager counterparts retired in 2020, Ms. McDonald filled position with a significantly less experienced 36year-old employee.

27.     Onken excelled in her HR Manager role, and her performance reviews and her direct supervisor made that clear. In fact, in 2021, Onken was invited and encouraged to apply for the prestigious Manager Champion Program due to her stellar manager engagement scores.

28.     Twice within the past year, Onken's supervisor told her, "you're the strongest HR people manager that I have."

29.     Onken continued to perform at the highest level in that position until her sudden termination in May of 2023.

30.     Throughout Plaintiff Onken's many years fulfilling IBM's HR needs, she continuously adapted to the changing HR landscape within and outside of the Company. Onken participated in individual and large-scale layoffs, she supported strategic hiring efforts, and facilitated major organization changes.

31.     Onken also innovated processes to keep the HR organization efficient and at the forefront of available technology. For example, in or about 2021, Onken initiated an effort to automate the Company's promotion process within the Consulting organization. The quarterly promotion cycle had been a laborious and manual process, and Onken worked with and advised IBM's technology developers to streamline and automate the process.

32.     Soon IBM's other business units began using the automated promotion tool. Onken received global recognition from IBM's Chief Global HR Officer Nickel LaMoreaux for her insights and contributions that led to the creation of the tool.

33.     In December of 2022, Onken received IBM's Cultural Catalyst award in recognition of Onken's dedication, ability to promote engagement and overall model performance.

34.     Despite Onken's undeniable competence and broad understanding of IBM's business, these qualities could not shield her from the Company's most recent layoffs in which age – or "runway" in IBM-speak – was a central criteria.

35.     Onken is deeply familiar with the Company's considerations during mass layoffs. Her supervisors and colleagues often discussed the criteria for choosing which "resources" – ie. human employees – would be subject to a given "resource action" – ie. layoff.

36.     A common refrain during those conversations was an assessment of the employees' "runway" with the Company. "Runway" at IBM refers, euphemistically to the number of years an employee will likely remain working before they retire.

37.     Decision-makers at IBM also often refer to the need for employees with "new skills" or "new energy" – ie. younger employees.

38.     Regardless of an employee's level of performance, history of contributions or proven ability to learn new skills, if their "runway" was short, ie. their age was high, IBM was more likely to put their employment on the chopping block. This was particularly true in 2023 with Plaintiff Onken.

39.     In or about January of 2023, Onken received two large boxes of documents from one of IBM's HR offices in California that was closing. As the most experienced HR manager in the Consulting organization, and because Onken had absorbed most of the California workload after another HR manager resigned, the boxes were sent to Onken to address.

40.     Inside these boxes, Plaintiff discovered pages and pages of documents listing IBM employees by their names, titles, ages and the nickname for each mass layoff that had affected each employee. Onken was quickly instructed to destroy the incriminating documents.

41.     Although the documents were not connected with any reduction in force that Plaintiff was working on at the time, they were clearly the relics of an earlier layoff in which age played a role in the decision-making process.

42.     In or about January of 2023 IBM history repeated itself. IBM announced internally and to the press that it intended to reduce its HR staff by approximately 50 percent.

43.     This was the culmination of a process started two years earlier with the diversion of many HR functions to call centers based in Asia. Then, with the introduction of "chatbots" and other AI tools, IBM quickly ramped up efforts to reduce the number of real humans handling human resources functions.

44.     In February 2023, Onken's supervisor, Ms. McDonald, informed Onken that she would not be part of this new reduction in force. Ms. McDonald advised Onken that IBM intended to keep top HR performers, and that Onken was needed to run the Atlanta office and to supervise all the HR Strategic Business Partners that she managed nationwide.

45.     Six weeks later Plaintiff Onken received a list of names – including her own – of employees that she was instructed to terminate. The people listed – IBM's best and brightest among the HR organization – were also some of the Company's oldest and most senior HR partners.

46.     When significant numbers of long-time top-performing employees expressed shock over their firing, they also questioned the criteria used by IBM to select employees for termination.

47.     IBM initially stated that it considered employees' skills, business unit knowledge and "ways of working" to determine who would be laid off.

48.     However, the contrast between this criteria and the people actually selected for termination was so drastic that Plaintiff Onken initially asked her supervisor if the list she received was a mistake.

49.     But there was no mistake. IBM was laying off more than 50 percent of its HR employees, and older age was the glaring characteristic shared by the majority of those who were terminated.

50.     After examining lists of terminated employees and discussing the layoffs with her peers, Onken observed that out of over 30 employees that she knew were being terminated, at least 20 of them were over 50 years old. She also noted that most of those older employees were also top performers.

51.     In some cases, IBM terminated older HR employees and then assigned younger HR employees smaller portions of the older employees' work under the guise of newly created HR titles.

52.     For example, after firing Onken, IBM divided her various roles and functions among four employees – all of whom were significantly younger than Onken and had fewer years of experience.

53.     When Plaintiff Onken inquired about the decision-makers and the decision-making process, IBM explained that only top-line managers were involved in determining which employees would be terminated. Thus, first line managers – the people most familiar with each employee's capabilities – did not weigh in on the decision.

54.     Although IBM claimed that the top line managers based their decisions on three criteria – skills, "ways of working," and business unit knowledge – the facts on the ground told a different story. Plaintiff Onken observed that the employees keeping their jobs did not reflect the Company's most highly skilled or top performing employees with the broadest business unit knowledge.

55.     And, without the input of first-line managers, it is clear that the employees' actual skills and capabilities were not genuinely a factor.

56.     In fact, many young employees with lower performance ratings kept their jobs in the current layoff, while veteran top performers – like Plaintiffs Onken and Wimbish – lost their positions.

57.     Further business unit knowledge was also demonstrably not a true factor in the decision-making process.

58.     For example, after two decades of employment throughout the IBM organization, Plaintiff Onken had the deepest business unit knowledge as compared to her peers and certainly as compared to her replacement.

59.     However, IBM terminated Onken and replaced her with four people who have demonstrably less skills, business unit knowledge or successful "ways of working."

60.     Further, some of Onken's responsibilities were assumed by younger employees in newly created positions or titles. IBM did not define these new jobs in its HR system, nor did it post these jobs so that employees could fairly compete for the roles. Instead, IBM selected younger employees that it presumed, based on stereotypes, would have a longer "runway" and an easier time adapting to new technology.

61.     The more Plaintiff Onken questioned the criteria IBM used to select employees for layoff, the more apparent it became that IBM's top criteria was age, or in IBM-speak, "runway."

62.     When Onken asked for the definition of "ways of working" criteria used in the layoff process, she received a list of six criteria.

63.     For example, one "ways of working" parameter was an employee's "uses analytics to build deeper understanding of the dynamics and drive actionable insights." Plaintiff Onken observed that in fact, IBM laid off its strongest and most senior analytics people – who also were its older employees.

64.     Another "ways of working" criteria considered an employee's knowledge in "labor/legal matters for the market/country where they operate." As described more fully below, IBM fired its older, more experienced employees like Plaintiff Wimbish, the HR organization's go-to resource for all things labor and legal in the business unit in which she operated, despite excelling in the realm of labor and legal matters.

65.     Of the four HR Managers comprising Onken's team, the two oldest (including Onken) were terminated, while the younger lower performing HR Managers remain employed.

66.     According to Plaintiff Onken's direct supervisor, Onken and the other terminated HR Manager were both the most experienced managers with top engagement and the broadest business experience on the team.

67.     In the wake of Onken and her older colleague's terminations, IBM created six new roles which would assume Onken's and her older colleague's responsibilities. These jobs were not posted or offered to any older, more experienced employees. Instead, top leadership at IBM appointed people into those roles. Four of the six new HR roles on Onken's former team were filled by employees in their 40s.

68.     Plaintiff Onken pointed out to her supervisor that she was not only told that she would not be part of the layoff, but that she also checked all boxes according to IBM's stated criteria. Further, Plaintiff Onken's experience in the Consulting organization was so broad that even HR executives had narrower knowledge.

69.     Plaintiff Onken's supervisor responded that IBM needed "new skills." Ms. McDonald further stated that IBM was moving toward use of a new call center technology called ZenDesk, and needed people "comfortable using the new technology." Ms. McDonald clearly

failed to recognize Onken's long history with innovative use of call centers, obvious comfort with new technology as a former programmer and recognized innovator.

70.     Plaintiff Onken also complained that she is more qualified for the newly-created positions on her team that were given to younger employees.

71.     In response, Plaintiff Onken's supervisor explained that she did not think Plaintiff Onken "would enjoy working with the new ZenDesk technology" – insinuating that Plaintiff Onken was too old to adapt to this new cutting edge technology.

72.     On April 26, 2023, Plaintiff Onken wrote to IBM's HR headquarters and complained about the blatant age discrimination she observed in the execution of IBM's most recent "resource action."

73.     A week later, the investigator assigned to Plaintiff's complaint simply stated that the layoff was "not an age thing."

74.     Plaintiff then learned that only half of the HR employees slated to stay with IBM would be employing the new ZenDesk technology. The rest of the HR employees would continue using the existing technological tools.

75.     Clearly, IBM used age as a significant criteria in its recent layoff of HR employees. Further, the Company's attempts to cover its tracks with seemingly neutral criteria for its decisions cannot overcome the obvious pretext of those criteria.

76.     Even the Company's stated desire to keep employees most able to adapt to new technology does not match with the actuality that only approximately half of the HR employees remaining are slated to use that new technology.

12

77.    Conveniently, IBM formally adopted a policy and practice of not providing terminated employees over the age of 40 with demographic data concerning the names, ages and roles of all employees slated for termination.

78.    As a result of Defendant's illegal and intentional actions, Plaintiff Onken has suffered and continues to suffer lost income and serious emotional distress.

## BACKGROUND FACTS – WIMBISH

79.    Plaintiff Wimbish began her tenure with IBM in August of 2003 as an HR Partner. In that role she served as an HR generalist, providing broad HR support for employees and managers in the systems engineering group.

80.    Wimbish worked with the employees assigned to her to facilitate hirings, terminations, benefits plans, promotions, compensation packages, etc.

81.    Upon information and belief, IBM employs a team of between 400 and 500 HR professionals in the U.S. alone. These HR partners address the HR needs of IBM's approximately 150,000 employees.

82.    In 2004, Plaintiff Wimbish was promoted to an Executive and Employee Compensation Specialist within the Global Finance organization of IBM.

83.    After 18 months in that position, IBM offered Wimbish the role of Senior HR partner to the Global Markets Americas Financial Services Sector ("FSS") leader.  In this role, she was the lead HR partner for a multi-billion dollar business.  She directly supported the FSS General Manager for his personal HR needs, as well as having overall responsibility for the activities of local, in-country HR partners in North, South and Central America supporting over 400 FSS employees.

84.    In 2007, IBM promoted Wimbish again to Global Business Unit HR Leader for IBM's Global Markets Worldwide SMB (small and medium business) General Manager. This position significantly expanded her scope of responsibility. In this role, Wimbish was at the highest non-executive position available within the HR organization.

85.    In that role, Wimbish provided strategic advice and counsel to the General Manager to support critical executive decisions, including global restructuring, succession planning and staffing of key positions around the world.  She also provided program direction and guidance to local HR partners supporting country and geography leaders in areas such as performance management, assessment, compensation, retention and employee engagement.

86.    As part of Wimbish's succession planning responsibilities, she worked with a designated IBM succession planning team that tracked the skills and qualifications of potential successors to high-level positions. Wimbish often witnessed how that team would identify employees with significant relevant experience but then determine that – based on the employee's age – the employee had little "runway." Then the employee in question would not be considered for a successor role.

87.    In 2015, Plaintiff Wimbish was contacted by a peer of Onken's looking for an experienced Senior HR Partner to provide guidance within the Company's Consulting business. Upon expressing personal interest in the role, Wimbish was immediately referred for and quickly hired on the IBM Consulting HR team. She served in that role until her termination on May 4, 2023.

88.    Throughout her employment, Wimbish's performance reviews were consistently positive and more often excellent.

89.     During her eight years as an HR Partner, Wimbish helped improve the quality and user adoption of new technology platforms such as overseas call centers and AI chatbots, as well as other significant changes to business processes.

90.     Plaintiff Wimbish quickly mastered any project and adapted to new ways of working on a regular basis. Throughout all roles with IBM, Wimbish exhibited significant adaptability, quickly adjusting to the frequent changes in methods and processes that characterized IBM's business.  Wimbish's skills were always current and she consistently incorporated IBM's key principles of new ways of working, such as Agile methodology and Design Thinking.

91.     She was also the employee designated to acclimate new HR Partners to the Consulting group. Within her organization, Wimbish was also the legal "guru" that her colleagues in HR often consulted regarding sensitive legal matters.

92.     When, in June 2022, IBM doubled the number of senior managers and executives Wimbish supported, Plaintiff not only adapted quickly, she also proactively created tools to provide to those employees that explained how the change in HR, including the transition to the use of more AI tools and call centers, would affect them. IBM neglected to prepare that important information for its senior managers and executives.

93.     Plaintiff Wimbish taught IBM senior managers and executives how to effectively engage with the Company's new "bot" that would be replacing much of the human support that these high-level employees were accustomed to.

94.     IBM then cut the number of employees each HR Partner supported and forced 80 percent of its senior managers and executives to only use the IBM bot and "Center of Excellence" – IBM-speak for outsourced call centers – for their HR needs.

95.     As a highly-skilled HR professional, and with extensive experience in technology firms, Wimbish easily adapted to the new procedures IBM adopted.

96.     Then, on or about March 3, 2023, Wimbish participated in conversations with leadership of the Consulting organization regarding who the Company was considering for termination. Wimbish found that she had to remind leadership that decisions had to be based on objective criteria as opposed to factors such as age or gender.

97.     On one occasion, when discussing how to assess a particular employee according to IBM's 9-box assessment parameters, Wimbish heard one leader state that he would not give a certain high-performing employee a top rating because the employee "doesn't have much runway," ie. the employee is older.

98.     In another recent layoff-related conversation, Wimbish listened while leadership discussed their desire to fire a 70-year-old employee who had been a top-performer for years. Wimbish had to remind them that the employee had phenomenal sales numbers and there was no non-age-based reason to terminate him.

99.     While Wimbish may have protected that individual employee, she was not able to escape IBM's practice of firing people on the basis of age.

100.     On or about April 4, 2023, Plaintiff Wimbish was informed that her stellar 20-year career with IBM was over as a result of the most recent mass layoff of IBM's HR employees.

101.     Wimbish also learned that Tanya Gaskins, the most junior HR employee on Wimbish's team, who Wimbish had trained herself, would remain employed and would be taking on the HR Partner role to support Wimbish's prior executive clients.

102.    As part of this same layoff, IBM also terminated one of Wimbish's colleagues, another woman in her 60s with a history of good performance, and transferred that employee's responsibilities to Ms. Gaskins.

103.    When Plaintiff Wimbish inquired about the criteria used to select employees for termination, she too was told that IBM considered employees' skills, "ways of working," and business knowledge.

104.    Wimbish's direct manager advised that "skills" were specifically "HR skills," "ways of working" included use of collaboration tools such as Mural and Trello, and "business knowledge" meant the Partner's knowledge of the IBM Business unit they supported.

105.    These criteria were certainly not used to make employment decisions in this recent layoff.

106.    For example, Ms. Gaskins is demonstrably less qualified and does not have any HR generalist background or experience outside of what she learned from Wimbish in 2021. Clearly, her skills, business unit knowledge and ways of working were not superior or even equal to that of Plaintiff Wimbish. Ms. Gaskins is, however, significantly younger than Plaintiff Wimbish.

107.    As a result of Defendant's illegal and intentional actions, Plaintiff Wimbish has suffered and continues to suffer lost income and serious emotional distress.

### BACKGROUND FACTS COMMON TO WIMBISH & ONKEN BASED ON INFORMATION LEARNED IN DISCOVERY

108.    As noted above, IBM has adopted a policy and practice of not providing terminated employees over the age of 40 with demographic data concerning the names, ages and roles of all employees slated for termination. IBM did not provide such data to Plaintiffs at the time of their termination.

109.    Two senior IBM HR executives, Carol Gordon and Dina McDonald, were delegated the responsibility for making selection decisions as to which HR employees would be terminated in the 2023 reduction in force ("RIF") as it applied to IBM's United States Human Resources organization.

110.    In September 2024, as part of discovery in this action, IBM identified all Human Resources employees who were considered together with Plaintiffs by Gordon and McDonald for termination in the 2023 RIF as it applied to IBM's United States Human Resources organization. IBM identified a total of 79 HR employees, including Plaintiffs, who were considered together.

111.    In February 2023, Gordon, McDonald, and approximately five other senior HR executives attended a meeting the goal of which was to assess the HR employees who were part of the selection pool. First-line managers of the HR employees did not participate in this assessment meeting.

112.    To assess and select the HR employees who would be terminated in the 2023 RIF as it applied to IBM's United States Human Resources organization, three criteria were considered: the employees' performance, skills, and "fit" for a new Human Resources model IBM intended to introduce following the RIF.

113.    These criteria were inherently subjective in both their consideration and application.

114.    For example, with respect to the "performance" criterion, attendees of the assessment meeting were not provided with any guidance about how, if at all, the HR employees' past documented performance ratings should factor into the attendees' assessment of the employees' performance for purposes of the meeting. Nor was there any formula that governed how the employees' past documented performance ratings should be weighted in the final selection

decisions. Finally, there was no direct correlation between the employees' past documented performance ratings and how the employees were assessed in terms of performance with respect to the RIF selection decisions.

115.    The assessment and selection criteria of skills and "fit" were related – together they were intended to consider whether the HR employees exhibited skills and "ways of working" that IBM valued. These included whether the HR employees were "agile" and "flexible," exhibited innovative and "transformational" qualities, exerted "thought leadership" and executed HR programs to create business value, used data to develop meaningful insights, used technology masterfully, acted with independence and autonomy, exhibited knowledge of and worked to understand the market and IBM's business model, and developed "trusting relationships" with leadership, management, and employees.

116.    The attendees of the assessment meeting were not provided with guidance as to how the above skills should be weighted in their assessment determinations.

117.    The attendees of the assessment meeting were not required to record or submit their individual rankings of the considered HR employees.

118.    During the assessment meeting, each employee in the selection pool was assigned a rating of high, medium, or low in terms of performance and skills. These ratings were assigned solely on what was discussed during the assessment meeting, without reference to the employees' prior documented performance ratings.

119.    There were numerous discrepancies between these ratings and the ratings HR employees received on their most recent documented performance reviews. For example, although Plaintiff Wimbish received a rating of "Exceptional" in the "Skills" portion of her most recent documented performance review – the highest of three available ratings on those reviews – she

was rated only a "Medium" in terms of Skills during the assessment meeting. Similarly, although Plaintiff Onken received ratings of "Successful" on all portions of her most recent documented performance review – the second of three available ratings on those reviews – during the assessment meeting she was rated "Low" in both performance and skills.

120. Once the HR employees were assigned high, medium, and low ratings in terms of performance and skills during the assessment meeting, they were then again grouped into three categories: top, core, and bottom. Again, there was no correlation between these three categories and the high, medium, and low ratings assigned to each HR employee during the assessment meeting. For example, while Plaintiff Wimbish received ratings of "medium" in both performance and skills during the assessment meeting, she was placed into the "bottom" category.

121. Immediately after the assessment meeting, Gordon and McDonald met to select those HR employees who would be terminated in the RIF, using the same criteria of performance, skills, and "fit" to make the selections. All HR employees who had been placed into the "bottom" category during the assessment meeting – including Plaintiffs Wimbish and Onken – were selected for termination.

122. In short, HR employees were selected for inclusion in the RIF based on entirely subjective criteria, and some of those criteria, such as being "agile" and "flexible," invited the application of subconscious stereotypes and prejudices to the detriment of older employees.

123. In discovery in this action, IBM produced documents containing the birth dates and ages of all HR employees considered for termination in the 2023 reduction in force.

124. Of the 79 individuals (including Plaintiffs) considered together for inclusion in the 2023 reduction in force, a total of 38 were selected for termination in the 2023 layoff.

125.    Of the 79 individuals (including Plaintiffs) considered together for inclusion in the 2023 reduction in force, 16 were under the age of 40 at the time of the layoff while 63 individuals were aged 40 or above at the time of the layoff.

126.    Of the 16 individuals under age 40 who were considered, 4 were selected for termination in the layoff. Thus, individuals under age 40 were selected for termination in the reduction in force at a rate of 0.25 (4 divided by 16).

127.    Of the 63 individuals aged 40 or above who were considered, 34 (including Plaintiffs) were selected for termination. Thus, individuals aged 40 or above were selected for termination in the reduction in force at a rate of 0.54 (34 divided by 63).

128.    HR Employees under 40 were thus selected for termination in the 2023 layoff at a rate less than four-fifths (.80) the rate that employees aged 40 or above were selected for termination in the layoff (0.25 divided by 0.54 equals 0.46).

129.    Additionally, the proportion of employees aged 40 or above selected for termination in the layoff (34 out of 63) is more than two standard deviations above the proportion of total employees selected for termination in the layoff (38 out of 79).

130.    The manner in which IBM selected employees for inclusion in the layoff that affected Plaintiffs' employment thus had a clear disparate impact on employees over the age of 40, including Plaintiffs.

131.    In addition, of the 79 individuals (including Plaintiffs) considered together for inclusion in the 2023 reduction in force, 27 were under the age of 50 at the time of the layoff while 52 individuals were aged 50 or above at the time of the layoff.

132.    Of the 27 individuals under age 50 who were considered, 7 were selected for termination in the layoff. Thus, individuals under age 50 were selected for termination in the reduction in force at a rate of 0.26 (7 divided by 27).

133.    Of the 52 individuals aged 50 or above who were considered, 31 (including Plaintiffs) were selected for termination. Thus, individuals aged 50 or above were selected for termination in the reduction in force at a rate of 0.60 (31 divided by 52).

134.    HR Employees under 50 were thus selected for termination in the 2023 layoff at a rate less than four-fifths (.80) the rate that employees aged 50 or above were selected for termination in the layoff (0.26 divided by 0.60 equals 0.43).

135.    Additionally, the proportion of employees aged 50 or above selected for termination in the layoff (31 out of 52) is more than two-and-a-half standard deviations above the proportion of total employees selected for termination in the layoff (38 out of 79).

136.    The manner in which IBM selected employees for inclusion in the layoff that affected Plaintiffs' employment thus had a clear disparate impact on employees over the age of 50, including Plaintiffs.

137.    Debra Adams, the Human Resources executive responsible for providing advice and guidance to Gordon and McDonald during the selection process, did not perform any analysis into whether the selection process for the 2023 RIF resulted disproportionately impacted older HR employees.

### FIRST CLAIM FOR RELIEF
**Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*) ("ADEA") –
Intentional Age Discrimination**

138.    Plaintiffs Onken and Wimbish reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

139.     Defendants have intentionally discriminated against Plaintiffs on the basis of their age by treating Plaintiffs less well than their younger colleagues and by taking adverse employment actions against Plaintiffs on the basis of their age.

140.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs have suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

141.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs have suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiffs' good name and reputation, lasting embarrassment, and humiliation.

142.     As a result of Defendant's unlawful conduct, Plaintiffs are entitled to compensatory damages, including but not limited to lost wages and damages for emotional distress, physical injuries, and medical treatment, and such other legal and equitable relief as this Court deems just and proper.

## SECOND CLAIM FOR  RELIEF
**New York State Human Rights Law ("NYSHRL") – N.Y. Exec. Law §§ 290 *et seq.*
Intentional Age Discrimination**

143.     Plaintiff Wimbish realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

144.     In violation of NYSHRL, Defendant intentionally discriminated against Plaintiff Wimbish on the basis of her age.

145.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff Wimbish has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

146.        As a direct and proximate result of Defendant's unlawful conduct, Plaintiff Wimbish has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

147.        As a result of Defendant's unlawful conduct, Plaintiff Wimbish is entitled to compensatory damages, including but not limited to lost wages and damages for emotional distress, physical injuries, and medical treatment, and such other legal and equitable relief as this Court deems just and proper.

## THIRD CLAIM FOR  RELIEF
### Atlanta Fair Private Employment Act - Age Discrimination

148.        Plaintiff Onken realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

149.        In violation of the Atlanta Fair Private Employment Act, Defendant intentionally discriminated against Plaintiff Onken on the basis of her age.

150.        As a direct and proximate result of Defendant's unlawful conduct, Plaintiff Onken has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

151.        As a direct and proximate result of Defendant's unlawful conduct, Plaintiff Onken has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

152.        As a result of Defendant's unlawful conduct, Plaintiff Onken is entitled to compensatory damages, including but not limited to lost wages and damages for emotional

distress, physical injuries, and medical treatment, and such other legal and equitable relief as this Court deems just and proper.

### FOURTH CLAIM FOR RELIEF
**Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*) ("ADEA") –
Disparate Impact Age Discrimination**

153.        Plaintiffs Onken and Wimbish reallege and incorporate by reference all preceding paragraphs as if they were set forth again herein.

154.        At all times relevant, Plaintiffs were employees of IBM protected from discrimination on the basis of their age.

155.        Defendant's practice of: (1) restricting decision-making authority only to upper-level managers without soliciting input from first-line managers must familiar with the HR employees' capabilities; and (2) using inherently subjective criteria to determine who would be selected for termination in the layoff that affected Plaintiffs' employment had a disproportionate adverse effect on employees over the age of 40, including Plaintiffs.

156.        As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs have suffered, and continue to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

157.        As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs have suffered, and continue to suffer, substantial non-monetary damages, including, but not limited to emotional distress, damage to Plaintiffs' good name and reputation, lasting embarrassment, and humiliation.

158.        As a result of Defendant's unlawful conduct, Plaintiffs are entitled to compensatory damages, including but not limited to lost wages and damages for emotional distress, and such other legal and equitable relief as this Court deems just and proper.

### FIFTH CLAIM FOR  RELIEF

**New York State Human Rights Law ("NYSHRL") – N.Y. Exec. Law §§ 290 *et seq.***
**Disparate Impact Age Discrimination**

159.     Plaintiff Wimbish realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

160.     At all times relevant, Plaintiff Wimbish was an employee of IBM protected from discrimination on the basis of her age.

161.     Defendant's practice of: (1) restricting decision-making authority only to upper-level managers without soliciting input from first-line managers must familiar with the HR employees' capabilities; and (2) using inherently subjective criteria to determine who would be selected for termination in the layoff that affected Plaintiffs' employment had a disproportionate adverse effect on employees over the age of 40 and on employees over the age of 50, including Plaintiff Wimbish.

162.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff Wimbish has suffered, and continue to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

163.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff Wimbish has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

164.     As a result of Defendant's unlawful conduct, Plaintiff Wimbish is entitled to compensatory damages, including but not limited to lost wages and damages for emotional distress, and such other legal and equitable relief as this Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

A.  An award of damages, according to proof, including, back pay, front pay, compensatory damages, emotional distress damages, liquidated damages, and punitive damages, to be paid by Defendant;

B.  Penalties available under applicable laws;

C.  Costs of action incurred herein, including expert fees;

D.  Attorneys' fees;

E.  Pre-judgment and post-judgment interest, as provided by law; and

F.  Such other and further legal and equitable relief as this Court deems necessary, just and proper.

Dated:  New York, New York
        January 17, 2024

Respectfully submitted,

JOSEPH & KIRSCHENBAUM LLP


By: __*s/Lucas C. Buzzard*_____
    D. Maimon Kirschenbaum
    Lucas C. Buzzard
    32 Broadway, Suite 601
    New York, NY 10279
    Tel: (212) 688-5640
    Fax: (212) 688-2548

*Attorneys for Plaintiffs*


## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all causes of action and claims with respect to which they have a right to jury trial.