**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

PAMELA WIMBISH and PATRICIA ONKEN,

          Plaintiffs,

    v.

IBM, INC.,

          Defendant.

No. 23-cv-08327

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

---

**JOSEPH & KIRSCHENBAUM LLP**

D. Maimon Kirschenbaum
Lucas C. Buzzard
32 Broadway, Suite 601
New York, NY 10004
Tel: (212) 688-5640

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................ i

**COUNTERSTATEMENT OF FACTS** ............................................................................. 1

   **I.**    PLAINTIFFS & IBM'S METHODOLOGIES GOVERNING SELECTION OF EMPLOYEES FOR "STAFF REDUCTION" RESOURCE ACTIONS ........................................ 1

   **II.**   IBM IGNORES ITS OWN POLICIES AND METHODOLOGIES TO SELECT PLAINTIFFS AND OTHER U.S.-BASED HRPS FOR TERMINATION IN THE "PROJECT GRANITE" RA ........... 3

   **III.**  IBM'S SELECTION PROCESS RESULTS IN A STATISTICALLY SIGNIFICANT ADVERSE IMPACT ON OLDER HRPS ............................................................................. 7

**ARGUMENT** ........................................................................................................................ 8

   **I.**    IBM IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DISPARATE TREATMENT CLAIMS ............................................................................... 8

      A.   Plaintiffs Establish their Prima Facie Case .................................................... 9

      B.   There is Ample Evidence from Which Reasonable Jurors Could Conclude that IBM's "Legitimate" Reasons are Pretextual ............................... 15

   **II.**   IBM IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' DISPARATE IMPACT CLAIMS .......................................................................................... 18

      A.   Plaintiffs Identify a Specific Facially Neutral Employment Practice .......................... 19

      B.   Plaintiffs Have Met their Burden of Producing Evidence of Causation ...................... 21

      C.   There is no Merit to IBM's Argument that Plaintiffs Have not Offered "Legally Sufficient" Evidence of a Disparity .............................................. 23

      D.   IBM is Not Entitled to Summary Judgment on its RFOA Defense ............................. 25

      E.   Plaintiffs Exhausted their ADEA Disparate Impact Claims and Wimbish may Bring a Disparate Impact Claim under the NYSHRL ...................................... 26

**CONCLUSION** .................................................................................................................. 27

# TABLE OF AUTHORITIES

**Cases**

*Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456 (2d Cir. 2001) ...............................9

*Alfaro-Flecha v. ORC Int'l Inc.*, No. 15-cv-1402,
    2016 U.S. Dist. LEXIS 486 (S.D.N.Y. Jan. 5, 2016) ...........................................12

*Brown v. Daikin Am. Inc.*, 756 F.3d 219 (2d Cir. 2014)...................................................9

*Bunting v. Kellogg's Corp.*, No. 14-cv-621,
    2016 U.S. Dist. LEXIS 135448 (D. Conn. Sept. 30, 2016) ................................18

*Cherry v. Am. Tel. & Tel. Co.*, 47 F.3d 225 (7th Cir. 1995)...........................................9

*Cherry v. N.Y. City Hous. Auth.*, 564 F. Supp. 3d 140 (E.D.N.Y. 2021)........................9,10

*Dawson v. N.Y.C. Transit Auth.*, 624 F. App'x 763 (2d Cir. 2015)................................9

*Dean v. Univ. of Buffalo Sch. of Med. & Biomedical Scis.*,
    804 F.3d 178 (2d Cir. 2015)................................................................................8

*Delaney v. Bank of Am. Corp.*, 766 F.3d 163 (2d Cir. 2014)..........................................11

*Diamond v. Sokol*, 468 F. Supp. 2d 626 (S.D.N.Y. 2006)................................................23

*Diehl v. Xerox Corp.*, 933 F. Supp. 1157 (W.D.N.Y. 1996).) ..........................................22

*Doninger v. Niehoff*, 642 F.3d 334 (2d Cir. 2011)............................................................8

*Easterling v. Dep't of Corr.*, 783 F. Supp. 3d 323 (D. Conn. 2011) ..............................25

*Feingold v. New York*, 366 F.3d 138 (2d Cir. 2004)........................................................8

*Gallagher v. IBEW Local Union No. 43*,
    2008 U.S. Dist. LEXIS 81615 (N.D.N.Y. Oct. 15, 2008) ...................................22

*Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93 (2d Cir. 2010) ...................................15

*Graham v. Long Island R.R.*, 230 F.3d 34 (2d Cir. 2000) ..............................................9,10

*Hall v. N. Bellmore Sch. Dist.*, 55 F. Supp. 3d 286 (E.D.N.Y. 2014)..............................16

*Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61 (3rd Cir. 2017)..............................25

i

*Kaytor v. Elec. Boat Corp.*, 609 F.3d 537 (2d Cir. 2010).................................................8

*Lipitor (Atorvastatin Calcium) Mktg. v. Pfizer, Inc.*, 892 F.3d 624 (4th Cir. 2018).........24

*Lyon v. Paramount Global*, No. 22-cv-9229,
    2025 U.S. Dist. LEXIS 59110 (S.D.N.Y. Mar. 2025) .........................................9

*Martin v. Coinmach Corp.*, No. 15-cv-8137,
    2016 U.S. Dist. LEXIS 164834 (S.D.N.Y. Nov. 29, 2016) ..................................20,27

*McGuire-Welch v. House of the Good Sheperd's Tilton Sch.*,
    720 Fed. App'x 58 (2d Cir. 2018)) ...............................................................15,17

*Meacham v. Knolls Atomic Power Labs.*, 554 U.S. 84, 87 (2008) ..................................25

*Ndugga v. Bloomberg L.P.*, No. 20-cv-7464,
    2023 U.S. Dist. LEXIS 128584 (S.D.N.Y. July 25, 2023) ..................................20

*Rodriguez v. Town of Ramapo*, 412 F. Supp. 3d 412 (S.D.N.Y. 2019) ..........................20

*Ruiz v. County of Rockland*, 609 F.3d 486 (2d Cir. 2010).................................................9

*Schanzer v. United Techs. Corp.*, 120 F.Supp.2d 200 (D. Conn. 2000) ........................23

*Smith v. Xerox Corp.*, 196 F.3d 358, 370 (2d Cir. 1999)...................................12,13,19

*Stratton v. Dep't for the Aging for City of N.Y.*, 132 F.3d 869 (2d Cir. 1997) ................12

*Stern v. Trs. of Columbia Univ.*, 131 F.3d 305 (2d Cir. 1997)) ........................................17

*United States v. Hernandez-Estrada*, 749 F.3d 1154 (9th Cir. 2014)...............................24

*Woodman v. WWOR-TV, Inc.*, 411 F.3d 69 (2d Cir. 2005) ...........................................13,14

*Zurich Am. Life Ins. Co. v. Nagel*, 590 F. Supp. 3d 702 (S.D.N.Y. 2022) ......................16

**Statutes, Rules, and Regulations**

29 C.F.R. § 1625.7(e)(1)..................................................................................................25

29 C.F.R. § 1625.7(e)(2)..................................................................................................5,9

Plaintiffs Pamela Wimbish and Patricia Onken respectfully submit this memorandum in opposition to IBM's motion for summary judgment. For the reasons outlined below, that motion should be denied as to all of Plaintiffs' age discrimination claims.

## COUNTERSTATEMENT OF FACTS

I.    **PLAINTIFFS & IBM'S METHODOLOGIES GOVERNING SELECTION OF EMPLOYEES FOR "STAFF REDUCTION" RESOURCE ACTIONS.**

Plaintiffs are extraordinarily experienced Human Resources partners ("HRPs") who served IBM for decades. CSMF ¶¶ 16, 28.[1] During their employment, Plaintiffs were each on numerous occasions tasked with advising and supporting IBM managers responsible for identifying employees for termination in IBM's various resource actions ("RAs"). CSMF ¶¶ 21, 31, 33; PSAF ¶¶ 1-3. As a manager, Onken also made her own selection decisions in several IBM RAs. CSMF ¶¶ 33-35. In connection with each of these RAs, Plaintiffs were required to complete IBM's RA manager identification training, which sets forth IBM's policies applicable to several different types of RAs. PSAF ¶¶ 4-7.

IBM promulgates methodologies governing how employees are to be selected for RAs, including "staff reduction" RAs. PSAF ¶¶ 11-13. These methodologies require that managers making RA selection decisions first define a "job group" of employees eligible for selection. PSAF ¶ 15. Such groups: (1) must be composed of employees with "interchangeable skills [who are] performing the same job responsibilities," PSAF ¶ 16; and (2) cannot include "Managers & non-managers," PSAF ¶ 17. To ensure consistency in the assessment of employees, only two consecutive

---

[1] In support of this memorandum, Plaintiffs cite the following: (1) Defendant's Statement of Material Facts ("SOF"); (2) Plaintiffs' Counterstatement of Material Facts ("CSMF"); (3) Plaintiff's Statement of Additional Facts ("PSAF"); (4) the deposition transcripts and other documents attached as lettered exhibits to the September 5, 2025 Declaration of Erika D. Cagney ("Cagney Decl."); (5) the documents attached as numbered exhibits to the November 11, 2025 Declaration of Lucas C. Buzzard ("Buzzard Decl."); and (6) the declarations of the various witnesses submitted in support and in opposition to Defendant's Motion (Carol Gordon, Debra Adams, Pilar Pons, Mahdina McDonald, Pamela Wimbish, Patricia Onken, and Steve Shapiro). The declarations and transcripts of depositions are identified by the declarant/deponent's last name (e.g., "Wimbish Decl." or "Gordon Dep.").

IBM job bands may be included in the same staff reduction job group because expectations and job roles are vastly different between, for example, employees at IBM Band 6 and employees at IBM Band 10. PSAF ¶¶ 18-19.

After defining the job group, managers must evaluate all employees using at least two objective job-related criteria such as past performance ratings, target attainment, utilization rates, and/or client satisfaction scores. PSAF ¶¶ 20-21. Managers must perform a comparative analysis by ranking employees in the group using those objective criteria, ensuring that (1) each employee is assessed using the same consistently defined factors as applied to all other employees, and (2) documentation is available to demonstrate that the rankings are supported by the same existing objective data for all employees in the group. PSAF ¶¶ 22-23. This documented comparative assessment using the same, consistently applied objective criteria is designed to: (1) ensure selection decisions are tailored and related to the job requirements and business needs; (2) eliminate reliance on subjective determinations or personal biases; and (3) ensure that documentation exists justifying the selections if they were ever challenged by selected employees. PSAF ¶ 24. IBM's general practice is that this comparative assessment be performed by the employees' immediate supervisor, who would have a first-hand view of their performance and skills. PSAF ¶ 25.

To ensure compliance with IBM's methodologies, an HRP is assigned to each manager making staff reduction selection decisions. PSAF ¶¶ 26-27. The HRP provides advice and counsel about how to define the job groups and how the objective selection criteria should be chosen and consistently applied to all employees in the group. PSAF ¶ 28. The HRP is responsible for confirming the manager's use of objective criteria and for verifying the availability and validity of the documentation and data supporting the selection decisions. PSAF ¶ 27. While the HRP participates in the selection process, their role is not to provide their own subjective opinion about particular

employees. PSAF ¶ 29. After the manager makes selection decisions, the HRP examines the file for consistency and validates the documentation used to rate and select the affected employees for separation. PSAF ¶ 30. ███████████████ REDACTED ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

PSAF ¶¶ 31-32. ███████████████ REDACTED ████████████████

████████████████████████████████████████████████████

████ PSAF ¶ 33.

## II.    IBM IGNORES ITS OWN POLICIES AND METHODOLOGIES TO SELECT PLAINTIFFS AND OTHER U.S.-BASED HRPS FOR TERMINATION IN THE "PROJECT GRANITE" RA.

In early 2023, IBM implemented an RA called "Project Granite" that resulted in layoffs across many of its business units, including its U.S.-based HR organization. PSAF ¶ 8. In February 2023, shortly before Project Granite was implemented, Carol Gordon was given the role of "Vice President, HR Partner Organization" with instructions to "build out" a "more simplified, integrated HR partner team." PSAF ¶ 38. This mainly involved shifting some HR responsibilities from human HRPs to an artificial intelligence "chatbot" called AskHR. CSMF ¶ 52. For example, before this shift, every "upline" manager at IBM (i.e., a manager to whom other managers reported) had a dedicated human HRP assigned to assist with their HR needs. CSMF ¶¶ 52-53. After the shift, only those upline managers whose organization exceeded a set number of employees received dedicated human HRP support. CSMF ¶ 53. For those upline managers whose organizations fell below the threshold, the first point of HR contact became the chatbot. CSMF ¶¶ 52-53. While this shift resulted in changes to IBM's HR organization, many of the roles in its new organization were "conceptually" the same as roles that existed prior to Gordon's appointment. *See* Adams Dep. at 176:7-177:22; McDonald Dep. at 60:10-61:6.

3

Days after her appointment, Gordon learned Project Granite would impact IBM's U.S.-based HR organization and that notifications would occur at the end of March 2023. PSAF ¶¶ 39-40. This was a "very tight timeline" that surprised members of Gordon's team. PSAF ¶¶ 41-42. Gordon was instructed to terminate 38 HRPs. CSMF ¶ 63. Although this was a "staff reduction," Gordon did not review or rely on IBM's "staff reduction" methodologies. PSAF ¶¶ 43-45. Instead, because Gordon and her team "had to move quickly" to comply with Project Granite's "defined calendar," PSAF ¶ 46, they used a "team-based" decision-making approach under which a "more senior team" of HR executives assessed the full population of eligible HRPs together, PSAF ¶ 47.

This approach was rushed. On February 21, Gordon emailed Pons that the identification HRPs to be included in Project Granite had to be submitted by February 24 and, before then, they had to finish defining the scope of the selection pool, define the selection criteria, have the senior team assess the HRPs in the pool, and make the selections. PSAF ¶ 48. Dina McDonald was not identified as a member of the assessment team in this email and was only added later that day. *See* PSAF ¶ 49. At 9:21pm on February 22, Gordon emailed the assessment team (including McDonald) to inform them that a 90-minute assessment meeting would convene at 10:30am the following morning and that she would be seeking their "input on performance, skills and best fit" of the HRPs in the selection universe. PSAF ¶ 51. These were the criteria used to assess and select HRPs for inclusion in Project Granite. *Id.* Gordon asked attendees to come prepared with their "high/medium/low" assessment of the HRPs' performance and skills. *Id.*

Attached to this email, Gordon included a PowerPoint listing numerous "skills" against which the HRPs were to be assessed. PSAF ¶ 52. She also attached a spreadsheet listing 77 HRPs in the selection pool. PSAF ¶ 53. These were the only documents provided to the assessment team before the meeting and no additional documents were given to the team during the meeting. PSAF

¶¶ 54-55. The selection pool spanned five consecutive IBM job bands, contained managers and non-managers, and included HRPs in different roles with different job responsibilities (AskHR, Business Unit ("BU") HRPs, and Upline HRPs). PSAF ¶¶ 56-58.

Although Debra Adams – the HRP assigned to provide "advice and counsel" to Gordon in the selection process – prepared a spreadsheet containing some of the HRPs' checkpoint performance review results for the prior two years, only Gordon received that spreadsheet. PSAF ¶ 59. Attendees of the assessment meeting: (1) were not required to record their own assessments, (2) did not individually assess all HRPs in the pool, (3) did not receive guidance about how HRPs' checkpoint performance ratings should factor into their assessment of the HRPs' performance, (4) were not required to review the HRPs' checkpoint performance ratings at all, (5) received no guidance about how the "skills" outlined in Gordon's PowerPoint should be weighted, and (6) did not perform a "skill-by-skill" assessment of the HRPs at all. PSAF ¶¶ 60-65. Indeed, although Gordon had asked attendees to come prepared with their "high/medium/low" assessment of HRP's performance and skills, there actually was no requirement that they provide their own assessment of how the HRPs' performance and skills should be ranked on this scale. PSAF ¶¶ 66-67.

The assessment meeting was attended by eight HR executives, including Gordon, Pons, Adams, and McDonald. CSMF ¶ 75. All HRPs in the selection universe were considered together without regard to job band, specific job duties, or their status as managerial employees. PSAF ¶ 69. During this meeting, there was no comparative analysis performed in which HRPs were compared to one another in terms of performance, skills, or fit. PSAF ¶ 70. Nor were the HRPs ranked "high/medium/low" in terms of skills or performance. PSAF ¶¶ 72-73. Instead, all HRPs in the pool were compared "against those skills that would be required in the new model," *i.e.*, the list of skills contained in Gordon's PowerPoint. PSAF ¶ 71.

Immediately after the assessment meeting, Gordon, McDonald, Adams, and Pons remained in the room to make selection decisions. PSAF ¶ 74. Although Gordon and McDonald were nominally responsible for making the final selections, Gordon admitted that she did not express any opinion about, or weigh in on, whether any given HRPs should or should not be selected. PSAF ¶ 76. Instead, her selection decisions were based on "the assessment Dina [McDonald] provided." PSAF ¶ 77. McDonald was 39 years old at the time of this meeting. PSAF ¶ 92. McDonald admitted she failed to prepare her own assessment of how the HRPs should be ranked on the "high/medium/low" scale and that she did not review the checkpoint performance ratings of all HRPs in the pool. PSAF ¶ 67-68. Although Adams was the HRP assigned to provide advice about the selection process, she weighed in on specific HRPs during the selection meeting and opined that both Plaintiffs should be selected. PSAF ¶¶ 93-97.

Based on the selection information provided by Gordon and McDonald, Adams recorded the placement of each HRP in the selection pool into "top," "core," and "bottom" categories. PSAF ¶ 75. It was only after the selection decisions were finalized by placing the HRPs into these categories that Adams went back and filled in the HRPs' supposed rankings of "high/medium/low" in performance and skills. PSAF ¶ 84. There was no direct correlation between the HRPs' checkpoint performance ratings and how they were rated in terms of "performance" for selection purposes. PSAF ¶ 82. Similarly, there was no requirement that HRPs have a certain amount of high checkpoint ratings to be rated "high" in performance for selection purposes. PSAF ¶ 83. Indeed, Adams admitted she did not rely on the HRPs' prior checkpoint results when entering the "high/medium/low" rankings in performance and skills. PSAF ¶ 85. Finally, even if there were some objective underpinnings for the HRPs' high/medium/low rankings in performance and skills

(there was not), there was no direct correlation between those rankings and the HRPs' placement in to the "top, core, and bottom" categories for selection purposes. PSAF ¶ 86.

After completing the selections, neither Gordon, McDonald, nor Adams undertook any effort to determine whether their selection decisions complied with age discrimination laws or had a disproportionate impact on older HRPs. PSAF ¶¶ 81-82, 91, 98. There is no evidence that anyone at IBM undertook any assessment to determine whether the selection of U.S.-based HRPs for inclusion in the Project Granite resource action had a disproportionate effect on older employees. PSAF ¶¶ 99-100.

III.    **IBM'S SELECTION PROCESS RESULTS IN A STATISTICALLY SIGNIFICANT ADVERSE IMPACT ON OLDER HRPS.**

This selection process not only favored younger employees with objectively worse performance and skills ratings than Plaintiffs, *see infra* at 9-12, but also resulted in the statistically significant selection of a greater proportion of older employees as compared to their younger peers. Plaintiffs' expert, Dr. Steven Shapiro, assessed the selection rate of all HRPs in the selection pool, as well as the comparative selection rates of: (1) HRPs under age 40 versus HRPs aged 40 and above; and (2) HRPs under age 50 versus HRPs aged 50 or above. PSAF ¶ 101. Dr. Shapiro found that 38 of the 79 HRPs in the selection pool, or 48%, were terminated. PSAF ¶ 102. However, only 25% of HRPs under age 40 were terminated, while 54% of HRPs age 40 or above were. Similarly, while only 26% of HRPs under age 50 were terminated, 60% of those aged 50 or above were fired. PSAF ¶ 104. Defendant's expert agreed that Dr. Shapiro's overall numbers and selection rates were correct. PSAF ¶ 105.

Dr. Shapiro found these selection rates resulted in a statistically significant impact on those HRPs aged 40 and above and those age 50 and above using two separate statistical tests – the Fisher's Exact Test and the two sample z-score test. PSAF ¶¶ 106. Application of these tests

indicated that: (1) the likelihood that the selection rate of those age 40 and over was due to chance was less than 4% (2.7% using the Fisher's exact test and 3.7% using the z-score test); and (2) the likelihood that the selection rate of those age 50 and above was due to chance was less than 1% (0.3% using the Fisher's exact test and 0.5% using the z-score test). PSAF ¶¶ 107. With respect to both populations (40 and over and 50 and over) the results of the statistical tests exceeded two standard deviations. PSAF ¶¶ 108.

## ARGUMENT

"Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Doninger v. Niehoff,* 642 F.3d 334, 344 (2d Cir. 2011). "The burden is on the moving party to establish the absence of any material factual issues." *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). If the movant satisfies this burden, the non-movant defeats summary judgment by identifying record evidence from which "a reasonable jury could find in the non-movant's favor." *Dean v. Univ. of Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 186 (2d Cir. 2015) (quotation marks omitted). The court "must draw all reasonable inferences in the favor of the nonmoving party, even though contrary inferences might reasonably be drawn." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010).

I.    **IBM IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DISPARATE TREATMENT CLAIMS.**

IBM asserts it is entitled to summary judgment on Plaintiffs' disparate treatment age discrimination claims because Plaintiffs cannot raise an inference of discrimination at the *prima facie* stage and then do not present a "triable issue" as to pretext at the final stage of the familiar *McDonnell Douglas* burden shifting framework. They are wrong on both fronts.

8

### A.  Plaintiffs Establish their Prima Facie Case

To establish a *prima facie* case of age discrimination under the ADEA, Plaintiffs must show, *inter alia*, that the "circumstances surrounding the [challenged] action give rise to an inference of discrimination." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). At the summary judgment stage, this burden is "*de minimis*," *id.* at 467, and "the Second Circuit has instructed courts to 'remember this exceedingly low burden.'" *Lyon v. Paramount Global*, No. 22-cv-9229, 2025 U.S. Dist. LEXIS 59110, at *30 (S.D.N.Y. Mar. 2025) (quoting *Dawson v. N.Y.C. Transit Auth.*, 624 F. App'x 763, 770 (2d Cir. 2015)).

IBM first argues that Plaintiffs' disparate treatment claims fail at the prima facie stage because Gordon and McDonald did not announce their discriminatory animus. Def's Mem. at 9-10. But "[n]o one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination." *Cherry v. N.Y. City Hous. Auth.*, 564 F.Supp.3d 140, 171 (E.D.N.Y. 2021). "A showing of disparate treatment – that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside h[er] protected group — is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Ruiz v. County of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010).

To be "similarly situated," the plaintiff must be "similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014). While the facts necessary to establish similarity in "all material respects" varies from case to case, the general inquiry is whether there is an "'objectively identifiably basis for comparability." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (quoting *Cherry v. Am. Tel. & Tel. Co.*, 47 F.3d 225, 229 (7th Cir. 1995)). A policy that is "uniformly applicable

to all members of a group may be a basis for comparing employees, regardless of particular job being performed." *Graham*, 230 F.3d at 42 (quoting *Cherry*, 47 F.3d at 229).

Plaintiffs were similarly situated in "all material respects" to every other HRP in the selection pool because they were subject to the same three, uniformly applied selection criteria: performance, skills, and best "fit" for the new organization. According to IBM's witnesses, all HRPs in the pool were assessed and selected based solely on these criteria, without regard to the HRPs' varying positions, specific job duties, band levels, or status as managers. *See* SOF ¶¶ 64-65, 74-75, 77, 88-89, 91; *see also* PSAF ¶¶ 69. The HRPs were evaluated by the same assessment team of senior executives and (at least according to IBM) all selection decisions were made by Gordon and McDonald. SOF ¶¶ 64-65, 75, 77, 88. Finally, the "skills" criterion was not only the most significant of the three selection criteria, but also provides a common point of comparison between HRPs that pre-existed the Project Granite selection process. *See* SOF ¶ 91 ("Gordon and McDonald . . . focused on getting those with the best skills for the New HR Model . . .."); Gordon Dep. at 82:18-84:5 (testifying that the "skills" and "fit" selection criteria were "related"); McDonald Dep. at 178:5-11 (testifying that all HRPs were considered together "compared against those skills that would be required in the new model"). Specifically, in connection with their 2022 performance reviews, the performance of all HRPs was assessed against the same list of "skills" that Gordon circulated to the assessment team and used in the Project Granite selection process in February 2023. *See* PSAF ¶¶ 34-37.

Because all HRPs were subject to the same "uniformly applicable" selection process, and because a crucial component of that process was an assessment of the same "skills" on which all HRPs' performance had been reviewed in the 2022 performance cycle, a reasonable juror could conclude that if either Plaintiff's 2022 "skills" Checkpoint performance rating exceeded that of a

significantly younger HRP who was *not* selected for termination, Plaintiffs were treated less favorably than that younger peer. That is precisely what the evidence shows. As IBM emphasizes, the Project Granite selections "happened 'around the same time'" as IBM's performance cycle which, at that time, covered the second half of 2022. SOF ¶ 83; McDonald Dep. at 86:22-87:3. On their Checkpoint performance reviews for that cycle, HRPs were rated on their skills using a three-level scale: "Growth Opportunity" (the lowest), "Successful" (the middle), and "Exceptional" (the highest). *See* Cagney Decl., Ex. Q at Column AB.[2] Wimbish's skills were rated "Exceptional" in that cycle, while Onken's were rated "Successful." *Id.* As the charts below demonstrate, there were several HRPs with lower skills ratings who were more than ten years younger than each Plaintiff and who were not identified for termination in Project Granite:

| Identification Status[3] | First Name | Last Name | Age[4] | 2H22 CP Skills[5] |
|---|---|---|---|---|
| Identified | Patricia | Onken | 66.6 | Successful |
| Not Identified | REDACTED | REDACTED | 29.6 | Growth Opportunity |
| Not Identified | REDACTED | REDACTED | 44.6 | Growth Opportunity |
| Not Identified | REDACTED | REDACTED | 55.2 | Growth Opportunity |

---

[2] Exhibit Q to the Cagney Declaration is an Excel spreadsheet on which rows with data for many HRPs have been collapsed. To see the entire data set for all HRPs listed on the sheet, all rows must be expanded.

[3] *See* Cagney Decl., Ex. V (Shapiro Report) at Ex. 2.

[4] *See* Cagney Decl., Ex. V (Shapiro Report) at Ex. 2.

[5] *See* Cagney Decl., Ex. Q at Column AB.

| Identification Status[6] | First Name | Last Name | Age[7] | 2H22 CP Skills[8] |
|---|---|---|---|---|
| Identified | Pamela | Wimbish | 61.5 | Exceptional |
| Not Identified | REDACTED | REDACTED | 29.6 | Growth Opportunity |
| Not Identified | REDACTED | REDACTED | 44.6 | Growth Opportunity |
| Not Identified | REDACTED | REDACTED | 43.0 | Successful |
| Not Identified | REDACTED | REDACTED | 50.7 | Successful |

While this evidence of disparate treatment is sufficient on its own to meet Plaintiff's "minimal" burden, the inference of discrimination is bolstered by Plaintiff's statistical evidence. It is well-settled that, "[i]n evaluating disparate treatment claims at the summary judgment stage, courts can and do rely on statistics to support an inference of discrimination." *Alfaro-Flecha v. ORC Int'l Inc.*, No. 15-cv-1402, 2016 U.S. Dist. LEXIS 486, at \*13 (S.D.N.Y. Jan. 5, 2016) (citing *Stratton v. Dep't for the Aging for City of N.Y.*, 132 F.3d 869, 877 (2d Cir. 1997) ("Although statistics play a much more substantial role in disparate impact cases, they are admissible to support a claim of discrimination even in a disparate treatment case involving a single plaintiff.")). Where, as here, the statistics involve a "comparison between persons evaluated by the same decision-maker," they are probative of intentional discrimination. *Smith v. Xerox Corp.*, 196 F.3d 358, 371 (2d Cir. 1999).

The statistics presented by Dr. Shapiro are damning. Through application of two separate statistical tests, he concluded that there was less than a 4% likelihood that the selection rate for those HRPs over age 40 was due to chance and a less than 1% likelihood that the selection rate of those HRPs over age 50 was due to chance. PSAF ¶¶ 107. Courts generally consider two standard deviations, or a 5% probability that the variation is due to chance, to be the "level of significance

---

[6] *See* Cagney Decl., Ex. V (Shapiro Report) at Ex. 2.
[7] *See* Cagney Decl., Ex. V (Shapiro Report) at Ex. 2.
[8] *See* Cagney Decl., Ex. Q at Column AB.

sufficient to warrant an inference of discrimination." *Smith*, 196 F.3d at 366. The percentages Dr. Shapiro found are well below this threshold, thus raising the inference of discrimination and discounting IBM's argument that its retention of a few HRPs older than Plaintiffs cancels out any inference of discrimination. IBM Mem. at 10.

IBM's attempts to undercut Plaintiffs' *prima facie* showing by arguing that Gordon's own age and the decisionmaker's purported unawareness of HRPs' ages negates any inference of discrimination. Def's Mem. at 10, 11. The first argument is easily put to bed by Gordon's admission that, far from being the "ultimate decisionmaker," *id.* at 11, she did not make *any* of her own selection decisions but instead based them all "on the assessment Dina [McDonald] provided." Gordon Dep. at 113:18-24; *see also id.* at 114:20-115:2. As McDonald – the only true decisionmaker – was only 39 at the time of the Project Granite selections, there can be no "inference against discrimination" here.

McDonald and Gordon's self-serving denials that they knew the ages of any HRPs in the selection pool are similarly unavailing. "[A] defendant's knowledge as to an ADEA plaintiff's relative age need not be demonstrated . . . by direct proof" and is "often established . . . simply through circumstantial evidence." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 83 (2d Cir. 2005). There is ample circumstantial evidence that the decisionmakers were aware of HRPs' ages. First, the Second Circuit holds that when an employer "maintain[s] employee age information in [its] personnel files," that "circumstance[] easily supports an inference of employer knowledge" at the *prima facie* stage. *Woodman*, 411 F.3d at 80. IBM maintained just such age information in employee files it produced for Plaintiffs and all other eligible HRPs. *See* Buzzard Decl. ¶¶ 9 & Exs. 8-9; *see also* Cagney Decl., Ex. V at Ex. 2 (Plaintiffs' expert report relying on IBM's employee files for the ages of all HRPs in the pool).

Second, McDonald testified she was "very hands on" with her organization, "work[ed] directly" with the HRPs in that organization, had "direct visibility" about Wimbish, and had "monthly one-on-ones" with Onken. McDonald Dep. at 103:9-18, 109:9-16. She also testified that she had access to HRPs' length of service at IBM, *see* McDonald Dep. at 202:8-19, which, when coupled with her "direct" interactions with Plaintiffs, raises the inference that she was aware each was well over 40 given that IBM employed Wimbish and Onken for 19 and 26 years respectively, *see* Buzzard Decl., Exs. 8 & 9. *See Woodman*, 411 F.3d at 80 (general awareness of employees' ages "from personal on-the-job-contact" "easily support[s] an inference of employer knowledge, certainly at the *prima facie* stage, where plaintiff's burden is minimal"); *id.* at 85 n.15 (postulating that in some circumstances "an employee's years of service might necessarily alert a defendant to the fact that her age was well past 40").

Finally, "a party's knowledge of a disputed fact may also be proved through evidence that he consciously avoided knowledge of what would otherwise have been obvious to him." *Woodman*, 411 F.3d at 84 n.14. Specifically, the law "does not tolerate a person shutting his eyes to a fact – such as the relative age of an employee – after realizing its high probability in order to deny he acted with the requisite knowledge and intent to discriminate." *Id.* IBM's decision-making team were the very highest echelon of its HR organization who, as discussed below, disregarded every staff reduction methodology developed by that very organization to minimize the precise discriminatory outcome presented by this case and then uniformly failed to undertake any analysis of whether that outcome potentially violated age discrimination laws. PSAF ¶¶ 81-82, 91, 98. Adams' conduct is particularly telling. As the HRP assigned to provide "advice and counsel" about the selection process, ███████████ REDACTED ███████████ ███████████ . PSAF ¶¶ 31-32, 93. Yet even after providing her

14

own opinion as to whether specific HRPs (including Plaintiffs) should be selected for the RA in contravention of IBM's established practices, she still failed to make the most basic inquiry into the impact the selection process had on older workers. PSAF ¶ 98. The notion that *these* HR executives in these circumstances did not know what they were doing is simply not something a reasonable juror is required to credit. *See Woodman*, 411 F.3d at 83-84 ("[I]n drawing inferences of knowledge from circumstantial evidence, a fact finder is not required to operate in an experiential vacuum" and "may draw on the full range of his reason, experience, and common sense.").

**B. There is Ample Evidence from Which Reasonable Jurors Could Conclude that IBM's "Legitimate" Reasons are Pretextual.**

IBM next argues Plaintiffs cannot demonstrate that its stated "legitimate" reasons for their terminations are pretextual. IBM Mem. at 13-18. Once an employer proffers some legitimate, non-discriminatory reason for its actions, the burden shifts back to the plaintiff to show that the employer's explanation is a pretext for discrimination. *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014). Under the ADEA, the plaintiff's ultimate burden is to show that age was a "but for" cause of the employer's action. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010). To defeat summary judgment on an ADEA claim, a plaintiff must demonstrate that a reasonable juror could conclude that the employer's explanations are pretextual and, but for her age, the employer would not have taken the action it did. *Id.* at 107. In the pretext analysis, the trier of fact may "'still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom.'" *McGuire-Welch v. House of the Good Sheperd's Tilton Sch.*, 720 Fed. App'x 58, 60 (2d Cir. 2018) (quotation omitted). In addition, but-for causation does not require the plaintiff to "prove that age discrimination was the only cause of [the employer's] adverse action, but only that [her] employment would not have been terminated in the absence of

a discriminatory motive." *Zurich Am. Life Ins. Co. v. Nagel*, 590 F. Supp. 3d 702, 730 (S.D.N.Y. 2022) (quotation omitted).

IBM advances two "legitimate" reasons for terminating Plaintiffs, both of which reasonable jurors could discount. First, IBM contends that the overall RA was justified by considerations of cost savings and the staff reductions supported its "new" HR model, "which was a complete reorganization and redesign" of its HR operating model. IBM Mem. at 12. As to cost savings, there is no evidence that *Plaintiffs'* terminations were necessary to effectuate those savings. To the contrary, Gordon was simply tasked with making 38 HRP selections for Project Granite without regard to job duties or job band, meaning that this same goal could have been accomplished by engaging in a different selection process – one that complied with IBM's own staff reduction methodologies. *See* SOF ¶ 63. As discussed above, there is evidence from which a reasonable juror could conclude that similarly situated younger HRPs received more favorable treatment in Gordon's chosen selection process, *supra* at 9-12, which "can also serve as evidence that [IBM's] proffered legitimate, non-discriminatory reason . . . was a pretext for . . . discrimination." *Graham*, 230 F.3d at 43; *see also Gorzynski*, 596 F.3d at 108. Moreover, there is evidence from which a reasonable juror could conclude that IBM's touted "new" model was not, in fact, a complete "redesign" of its HR organization, but rather simply a cynical repackaging of existing roles. *See* CSMF ¶¶ 55-61. Under the ADEA, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Hall v. N. Bellmore Sch. Dist.*, 55 F. Supp. 3d 286, 300 (E.D.N.Y. 2014) (quotation omitted).

IBM next argues that Plaintiffs' selections for Project Granite were "legitimate" because they were the product of a "robust" selection process. IBM Mem. at 12. It is well-settled, however,

that "an inference of pretext may arise where an employer's deviation from its procedures results in the challenged employment decision." *McGuire-Welch*, 720 Fed. App'x at 61 (citing *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 313-14 (2d Cir. 1997) ("[D]epartures from procedural regularity . . . can raise a question as to the good faith of the process where the departure may reasonably affect the decision.")). There can be no question that IBM's departure from its own staff reduction methodologies and complete failure to adhere to *any* of its internal procedures designed to guard against discriminatory RA decisions affected the selections here.

First, following IBM's methodologies requiring that job groups be differentiated by job responsibilities, band levels, and managerial status, and then requiring that those groups be assessed by the HRPs' first-line managers would have ensured that the selection criteria were applied to reasonably comparable groups of HRPs by the people with the most experience assessing the HRPs' actual skills. PSAF ¶¶ 15-25. IBM did not do that, instead allowing one 39-year-old who did not directly manage nearly 90% of the eligible HRPs to choose from a pool consisting of HRPs with different duties spanning five job bands from senior managers to entry level positions, all with less than 24 hours' notice. CSMF ¶ 69; PSAF ¶¶ 51, 56-58.

Second, demanding an actual comparative analysis of HRPs against one another using multiple objective, documented data points as IBM's procedures require, *see* PSAF ¶¶ 20-24, would have revealed that significantly younger employees with lower skills ratings than Plaintiffs received more favorable treatment. IBM also did not do that. PSAF ¶¶ 60-66, PSAF ¶ 70.

Third, ensuring that the HRP assigned to provide advice about this process remained neutral, verified compliance with IBM's methodologies, and then checked the results, would have guarded against the clear discriminatory outcome that resulted here. PSAF ¶¶ 26-32. But IBM did not do that either. Instead, Adams was an active participant in the selection process who then

17

buried her head in the sand rather than ascertain whether that process – in which she had a vested interest – resulted in the disproportionate selection of older HRPs. PSAF ¶¶ 93-98. What's worse, there is evidence from which a reasonable juror could conclude that Adams went back and whitewashed the data to make it appear a comparative analysis between HRPs had been done by entering "high/medium/low" rankings for the HRPs' performance and skills *after* the selections had already been made. PSAF ¶ 81; *see also* Cagney Decl., Ex. T at Columns I & J.

As may be seen, when coupled with Plaintiff's evidence of disparate treatment and statistically significant impact on older workers resulting from the selection process, this is clearly a case where "the procedural irregularities" Plaintiffs identify "contribute to the implication of discrimination," thus permitting a reasonable juror to find IBM's proffered "legitimate" reasons to be pretext for age discrimination. *Bunting v. Kellogg's Corp.*, No. 14-cv-621, 2016 U.S. Dist. LEXIS 135448, at *16-17 (D. Conn. Sept. 30, 2016). Furthermore, there is evidence from which a reasonable juror could conclude that IBM's admitted deviation from its own policies was not because following those policies would be inappropriate for its purported "large scale" restructuring as IBM argues, but rather because it simply did not want to take the time necessary to follow them given Project Granite's calendar. PSAF ¶¶ 40-42, 46. In sum, Plaintiffs' *prima facie* evidence plus the evidence of pretext described above mandates the denial of summary judgment on Plaintiffs' disparate treatment claims. *See Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013) (holding that plaintiff's *prima facie* case plus evidence of pretext sufficed to permit reasonable juror to infer that retaliation was the "but-for" cause of adverse action).

## II.    IBM is Not Entitled to Summary Judgment on Plaintiffs' Disparate Impact Claims.

IBM is also not entitled to summary judgment on Plaintiffs' disparate impact claims. "[D]isparate impact theory targets practices that are fair in form, but discriminatory in operation."

*Smith*, 196 F.3d at 364 (quotation marks omitted). "A plaintiff establishes a prima facie case of disparate impact by identifying a specific employment practice which, although facially neutral, has had an adverse impact on her as a member of a protected class." *Id.*

### A. Plaintiffs Identify a Specific Facially Neutral Employment Practice.

IBM argues that Plaintiffs failed to isolate a "specific" employment practice because: (1) McDonald was the direct supervisor of 9 out of the 79 HRPs in the selection pool; and (2) rather than rely on inherently subjective criteria, McDonald "incorporated multiple objective data points." IBM Mem. at 22. Plaintiffs' amended complaint contained numerous factual allegations demonstrating how the small group of executives, with only Gordon and McDonald responsible for the actual selection decisions, assessed and then selected HRPs for inclusion in Project Granite using three criteria (performance, skills, and fit) which were "inherently subjective in both their consideration and application" and were applied without being bounded by any objective rating system. Dkt No. 47 ¶ 112-13. Specifically, Plaintiffs detailed how: (1) attendees of the assessment meeting were provided no guidance about how documented performance ratings should factored or weighted in the analysis; (2) there was no "direct correlation" between documented performance ratings and the RA "performance" assessment; (3) no guidance was provided about how to weight the various skills in the assessment; (4) there was no direct correlation between the documented performance ratings, the "high/medium/low" rankings for assessment purposes or the "top/core/bottom" ratings for selection purposes; and (5) attendees of the assessment meeting were not required to submit their individual rankings of HRPs. *Id.* ¶¶ 112-22. These allegations were borne out by the evidence, which also contains numerous other examples of how the assessment and selections were performed (a) in the absence of any comparative analysis between HRPs as to

19

objective data points and (b) free of IBM's own guardrails designed to restrict decisionmakers' subjectivity. *See* PSAF ¶¶ 56-73, 82-86.

Courts routinely find that similar evidence that employment-related decisions are vested in small groups of individuals with discretion to apply criteria in a subjective manner without being cabined by objective rating systems are "specific employment practices" for purposes of a disparate impact claim. *See, e.g.*, *Ndugga v. Bloomberg L.P.*, No. 20-cv-7464, 2023 U.S. Dist. LEXIS 128584, at *15-16 (S.D.N.Y. July 25, 2023) (allegations that a small committee's "discretionary control over hiring and compensation" sufficiently identified a specific facially neutral policy); *Rodriguez v. Town of Ramapo*, 412 F. Supp. 3d 412, 439 (S.D.N.Y. 2019) (allegations that a governmental entity had "no objective rating system," which "allows for subjective assessments by Caucasian managers" that were "disproportionately unfavorable to minorities" adequately alleged a specific employment practice); *Martin v. Coinmach Corp.*, 2016 U.S. Dist. LEXIS 164834, at *17 (S.D.N.Y. Nov. 29, 2016) (finding that a "company's policy of making all merit increases dependent entirely on the discretion of a white supervisor, in the absence of any objective criteria to cabin or direct that individual's judgment is a 'specific employment practice'").

The fact that direct supervisors of some of the HRPs in the selection pool (18 out of the 79) participated in this process did not make this process any less subjective or discretionary. The reason why IBM generally requires first-line managers to make selection decisions is because they have direct insight into the performance of *all* HRPs in a selection pool and use that experience to perform a comparative assessment of those HRPs against the same, consistently applied objective criteria. *See* PSAF ¶¶ 22-25. None of that happened here. McDonald, for example, did not prepare any comparative ranking for the nine HRPs who reported directly to her, much less a comparative

ranking of those HRPs against the 70 who did not report directly to her. PSAF ¶¶ 67-68, 70. In sum, Plaintiffs have met their *prima facie* burden of identifying a specific employment practice.

### B.  Plaintiffs Have Met their Burden of Producing Evidence of Causation.

Relying primarily on the Supreme Court's *Wards Cove* decision, IBM next argues that Plaintiffs cannot establish causation because Dr. Shapiro did not rule out possible nondiscriminatory reasons for the statistical disparities he identified. Several observations put IBM's position into perspective. First, its witnesses admit that it followed an assessment and selection process in which: (1) the selection criteria of performance, selection, and fit were assessed by a small group without regard to the HRPs' job band, job duties, or managerial status; (2) there was no ranking of the HRPs' checkpoint performance ratings or comparative analysis of HRPs to one another in terms of performance, skills or fit; (3) there was no "direct correlation" between HRPs' performance ratings, their "high/medium/low" assessment ratings or their "top/bottom/core" selection categories; and (4) no "skill-by-skill" assessment of the HRPs was performed. PSAF ¶¶ 60-65, 69-70, 82-86. Second, its expert admits that Dr. Shapiro accurately captured: (1) the ages of all employees in the selection pool and (2) the number and proportion of employees in each age group who were terminated and retained in the Project Granite RA. PSAF ¶ 105. It is in the face of these admissions that IBM somehow argues that Plaintiffs have not raised an inference of causation between the selection process its witnesses admit it used and the outcome of that very process which its expert admits is accurate.[9]

IBM's causation argument is a complete red-herring. Notably, while it contends that Dr. Shapiro did not account for "possible nondiscriminatory reasons" for the statistical disparities he found, strikingly absent is any identification of what those possible reasons could be. *See* IBM

---

[9] To be sure, IBM has not and does move to exclude Dr. Shapiro's report is inadmissible pursuant to Fed. R. Evid. 702 and *Daubert*.

Mem. at 20-21. There is good reason for this, as the cases IBM cites demonstrate. First, in *Diehl v. Xerox Corp.*, selections for a reduction in force were made based on assessments in which employees' "last four performance appraisals and a skills assessment" were considered, and "points" were awarded in connection with each. 933 F. Supp. 1157, 1161 (W.D.N.Y. 1996). The employees "were then slotted on a matrix based on the overall assessment point total and tenure" and selections were made "in a pre-specified cell order beginning with the lowest cell." *Id.* The plaintiff's expert "refused to consider" the "skills assessments and performance history data" because she believed that data was "inherently unreliable." *Id.* at 1167-68. The court concluded that the expert's "categorical refusal to test the reliability of the skills and performance data undermines her conclusions and renders them inadequate as a matter of law." *Id.* at 1169.

In *Gallagher v. IBEW Local Union No. 43*, the plaintiffs challenged a certain union referral procedure and submitted an expert report "to prove the referral procedure caused older . . . workers to work less hours" than younger workers. 2008 U.S. Dist. LEXIS 81615, at *14 (N.D.N.Y. Oct. 15, 2008). But in that case "several other factors were identified as potential causes," including older workers "choosing to work less hours" and workers "choosing to limit the geographic area" in which they accepted jobs. *Id.* at *15. The expert "did not conduct any statistical analyses to eliminate these potential causes," and the court found this failure to defeat the plaintiffs' causation showing. *Id.* at *15-16.

The common thread connecting these cases is the availability of additional data and evidence of other causes that could have influenced the outcome the expert considered which the expert either consciously ignored or failed to consider. But no similar data exists here. IBM did not, for example, undertake any documented comparative analysis of the HRPs' performance ratings or attempt to award "points" to the skills the HRPs exhibited as was the case in *Diehl*.

Moreover, unlike in *Gallagher*, there is no cause for the termination of the HRPs in Project Granite other than IBM's selection process. Put differently, the only reason the 38 HRPs identified for Project Granite were terminated from IBM was because they were selected in the process described above, and because that process did not involve any objective comparative assessment using quantifiable data points that may be isolated, there is simply nothing comparable to the circumstances in IBM's cases that Dr. Shapiro could have controlled for but did not. Indeed, courts faced with similar selection processes in which no quantifiable data was taken into account have concluded that simply testing the "output of [the] decision making process" is permissible. *See Schanzer v. United Techs. Corp.*, 120 F.Supp.2d 200, 204-06 (D. Conn. 2000) ("[A]pplicable law does not mandate the use of a multiple regression analysis in every case in which statistical evidence forms some part of the proof, particularly where the variables that would be incorporated into such a regression analysis were not measured in any quantifiable fashion in the original decision by the employer"). Thus, IBM's causation argument is meritless.

### C. There is no Merit to IBM's Argument that Plaintiffs Have not Offered "Legally Sufficient" Evidence of a Disparity.

IBM next argues that Dr. Shaprio's application of the Fisher's Exact Test should be disregarded because, in its view, the "proper" way to use the test in a discrimination case is to look to whether the "observed result, *or a more extreme result* could have occurred by chance." Def's Mem. at 23 (citing two district court cases). IBM posits Dr. Shapiro misapplied the test because he examined only the likelihood of the "observed result" of the Project Granite selection process, and that its expert, who supposedly examined the likelihood of the observed result or a result more extreme, applied it in the correct manner. *Id.* at 23-24. Whatever the merits, this dispute is a classic "battle of the experts" about the proper application of a statistical test that is not properly resolved by the court on summary judgment. *See Diamond v. Sokol*, 468 F. Supp. 2d 626, 636 n.9 (S.D.N.Y.

23

2006) (Lynch, J.) ("The qualifications and opinions of dueling experts are issues for trial; defendant cannot win summary judgment on the strength of a contested expert opinion.").

More fundamentally, numerous courts have explained that the Fischer's exact test is applied in precisely the manner Dr. Shapiro did here – *i.e.*, to determine the likelihood that an *actual observed result* occurred by chance. *See Lipitor (Atorvastatin Calcium) Mktg. v. Pfizer, Inc.*, 892 F.3d 624, 634 (4th Cir. 2018) ("The Fisher's exact test compares all possible outcomes in a distribution against the results *actually observed* to determine whether there is a statistically significant association." (emphasis added)); *United States v. Hernandez-Estrada*, 749 F.3d 1154, 1164 (9th Cir. 2014) ("Fisher's Exact test is used to calculate the probability that the number of individuals of a particular race-selected or gender-selected classification would be the same *as the number actually selected*, if the selection were independent of race or gender." (emphasis added)).

Next, Dr. Johnson's conclusion that "proper" application of the Fisher's exact test results in only 1.81 standard deviations, *see* IBM Mem. at 24, is inherently suspect because he withheld crucial information. When the Fisher's exact test is run, the outcome is called a "p-value," which informs whether the "null hypothesis" (in this case the assumption that the proportion of HRPs 40 and over selected for termination would be the same as the proportion of HRPs under 40 selected) has been rejected. Shapiro Dep. at 56:24-58:12. Generally, if the p-value is 5% or less, then the null hypothesis is rejected and there is a statistically significant indication there was a disparate impact. *Id.* As Dr. Shapiro explained, his application of the Fisher's exact test to the selection rate of over/under age 40 HRPs yielded a p-value of 2.7 percent, which is greater than two standard deviations. *See* Cagney Decl., Ex. V at 2; Shapiro Dep. at 38:18-20. Dr. Johnson, however, never provided the p-value he calculated, either in his report or at deposition. *See* Cagney Decl., Ex. U ¶ 18; Johnson Dep. at 54:25-55:5. Instead, he just stated that if the "appropriate p-value" were used,

it would result in only "1.81 standard deviations." Cagney Decl., Ex. U ¶ 18. Because Dr. Johnson withheld the crucial output of the Fisher's test, and then simply skipped to 1.81 standard deviations without showing his work, his opinion about how the Fisher test should be properly applied holds no weight.

Finally, IBM's criticism of Dr. Shapiro's application of the z-score test and the EEOC's four-fifths rule of thumb are entirely misplaced. IBM provides no context or analysis to its bare statement that the z-score test assumes independence and therefore is improperly used in this circumstance, IBM Mem. at 24, and other courts have relied on the z-score test used in similar reduction in force cases. *See, e.g.*, *Karlo v. Pittsburgh Glass Works, LLC*, 84 F.3d 61, 81 n.14 (3d Cir. 2017). Moreover, many courts have concluded that reliance on the EEOC's four-fifths rule is appropriate where, as here, there is other evidence of statistical disparity. *See Easterling v. Dep't of Corr.*, 783 F. Supp. 3d 323, 332 (D. Conn. 2011).

### D. IBM is Not Entitled to Summary Judgment on its RFOA Affirmative Defense

IBM next contends that Plaintiffs "cannot overcome" its affirmative defense that its Project Granite selection decisions were based on reasonable factors other than age ("RFOA"). IBM bears the burden of proof on this defense, which requires it to both "produce evidence raising the defense" and "persuade the factfinder of its merit." *See Meacham v. Knolls Atomic Power Labs.*, 554 U.S. 84, 87 (2008). To establish this defense, IBM must "'show that the employment practice was both reasonably designed to further or achieve a legitimate business purpose and administered in a way that reasonably achieves that purpose in light of the particular facts and circumstances.'" IBM Mem. at 25 (quoting 29 C.F.R. § 1625.7(e)(1)).

The employment practice IBM identifies is the process of making selections by "assessing performance, skills, and fit." IBM Mem. at 25. As the regulation IBM cites explains, there are

several considerations "that are relevant to whether a practice is based" on an RFOA, including: (1) "the extent to which managers and supervisors were given guidance or training about how to apply the factor and avoid discrimination"; (2) "[t]he extent to which the employer limited supervisors' discretion to assess employees subjectively;" (3) "[t]he extent to which the employer assessed the adverse impact of its employment practice on older workers"; and (4) [t]he degree of the harm to individuals within the protected age group . . . and the extent to which the employer took steps to reduce the harm." 29 C.F.R. § 1625.7(e)(2). Here, for all of the reasons discussed above, there is ample evidence from which a reasonable juror could conclude that these considerations weigh against finding IBM's selection process to be a "reasonable" factor other than age, thus precluding summary judgment.

### E.  Plaintiffs Exhausted their ADEA Disparate Impact Claims and Wimbish may Bring a Disparate Impact Claim under the NYSHRL.

IBM argues Plaintiffs did not exhaust their ADEA disparate impact claims before the EEOC and that Wimbish may not bring a disparate impact claim based on the selection rate of those over age 50 under the NYSHRL. IBM Mem. at 26-27. These arguments were foreshadowed in IBM's premotion letter in opposition to Plaintiffs' request to amend their complaint to add disparate impact claims. *See* Dkt No. 37 at 2-3. Accordingly, Plaintiffs addressed them at length in their memorandum of law submitted in support of that motion. *See* Dkt No. 44 at 10-15 (addressing the exhaustion argument), 20-25 (addressing the NYSHRL argument). Ultimately, IBM decided not to oppose amendment. Dkt No. 42. In the interests of brevity, Plaintiffs respectfully refer the Court to the above relevant portions of their prior memorandum of law for a full discussion of these issues and make only brief points here.

As to IBM's exhaustion argument, it is not the case that Plaintiffs alleged in their EEOC charges only that IBM was "motivated by illicit consideration of age." IBM Mem. at 26. Instead,

they specifically alleged that IBM terminated Plaintiffs as part of a "mass layoff of HR employees" and that, "[r]ather than laying off its weakest, least experienced or least knowledgeable HR employees, IBM disproportionately terminated its older employees despite their high levels of performance." *See* Dkt No. 45-2 ¶¶ 1-2, 3; Dkt No. 45-3 ¶¶ 1-2. Both charges also contained allegations about IBM's criteria for selecting employees and asserted that older HR employees were terminated while younger HR employees were retained. *See* Dkt No. 45-2 ¶¶ 37-38, 40-42, 47, 51; Dkt No. 45-3 ¶¶ 25-29, 30. This put the EEOC on notice Plaintiffs were challenging selection practices that affected all older HRPs, thus demonstrating Plaintiffs' disparate impact claims are "reasonably related" to their Charges. *See Martin*, 2016 U.S. Dist. LEXIS 164834, at *10-11 (disparate impact claims exhausted when plaintiffs "made clear" in EEOC charges "they were challenging policies that affected all black technicians in their workplace, even as they also alleged specific instances of discrimination against them as individuals").

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion.


Dated: New York, New York
         November 11, 2025

                                        By:      *s/Lucas C. Buzzard*
                                                 D. Maimon Kirschenbaum
                                                 Lucas C. Buzzard
                                                 Leah Seliger
                                                 JOSEPH & KIRSCHENBAUM LLP
                                                 32 Broadway, Suite 601
                                                 New York, NY 10004
                                                 212-688-5640
                                                 *Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing opposition complies with the word-count limitation stated in SDNY Local Rule 7.1(c). Excluding the case caption, tables, this certification, and counsel's signature block, but including all footnotes, this brief contains 8,732 words. I make this certification using the word count feature of Microsoft Word.

_/s/Lucas C. Buzzard_____