UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
PAMELA WIMBISH and PATRICIA ONKEN,

                                Plaintiffs,

      - against -

IBM, INC.,

                                Defendant.
----------------------------------------------------------------x

**OPINION & ORDER
ON MOTION FOR SUMMARY
JUDGMENT**

No. 23-CV-8327 (CS)

Appearances:

D. Maimon Kirschenbaum
Lucas C. Buzzard
Joseph & Kirschenbaum LLP
New York, New York
*Counsel for Plaintiffs*

Matthew W. Lampe
Erika D. Cagney
Grace B. Gale
Jones Day
New York, New York

Katherine J. McLay
Jones Day
Pittsburgh, Pennsylvania
*Counsel for Defendant*

Seibel, J.

      Before the Court is Defendant's motion for summary judgment, (ECF No. 67).  For the

following reasons, the motion is GRANTED.

**I.**      **BACKGROUND**

      **A.**      **Facts**

      The following facts are taken from Defendant's Local Civil Rule ("L.R.") 56.1 Statement

(ECF No. 72 ("D's 56.1 Stmt.")), Plaintiffs' response to Defendant's 56.1 Statement, (ECF No.

81 ("Ps' 56.1 Resp.")), Plaintiffs' statement of additional facts, (ECF No. 83 ("Ps' Add. Stmt.")),

Defendant's response to Plaintiffs' statement of additional facts, (ECF No. 93 ("D's Add. Stmt.

Resp.")), and the supporting exhibits, and are undisputed unless otherwise noted.[1]

---

[1] Plaintiffs' Statement of Additional Facts consists of 109 paragraphs, many of which include facts that Plaintiffs find helpful but do not contend are in dispute, (*see, e.g.*, Ps' Add. Stmt. ¶¶ 1-3, 9, 12, 58, 75, 78), in violation of LR 56.1, which permits only a "short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." LR 56.1(b). "There is no provision for a responsive 56.1 Statement to include additional facts that are not in dispute but that a party opposing summary judgment simply thinks are important; any additional facts should be confined to material facts in dispute." *Ostreicher v. Chase Bank USA, N.A.*, No. 19-CV-8175, 2020 WL 6809059, at *1 n.1 (S.D.N.Y. Nov. 19, 2020); *see Allen v. Koenigsmann*, No. 23-CV-5651, 2024 WL 403113, at *3 (S.D.N.Y. Feb. 2, 2024). (Unless otherwise indicated, all case quotations omit internal citations, quotation marks, alterations and footnotes.) I therefore consider the Statement of Additional Facts only to the extent it contains material facts that the parties genuinely dispute.

Further, some of Plaintiffs' responses to Defendant's 56.1 statements merely add facts or dispute only a portion of Defendant's statement, (*e.g.*, Ps' 56.1 Resp. ¶¶ 14, 33-35, 51-54, 66, 69, 71, 76), which is insufficient to dispute the entirety of that statement, *see, e.g.*, *Johnson v. City of N.Y.*, No. 15-CV-6915, 2019 WL 294796, at *10 n.8 (S.D.N.Y. Jan. 23, 2019) ("56.1 statements not explicitly denied by plaintiff are deemed admitted."); *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012) (improper to "interject[ ] arguments and/or immaterial facts in response to facts asserted by Defendant, without specifically controverting those facts"); *Clarendon Nat'l Ins. Co. v. Culley*, No. 11-CV-2629, 2012 WL 1453975, at *2 & n.3 (S.D.N.Y. Apr. 25, 2012) (finding fact undisputed where Plaintiff only disputed a portion of a paragraph); *see also Baity v. Kralik*, 51 F. Supp. 3d 414, 418-19 (S.D.N.Y. 2014) (responses that merely "quibble with Defendant['s] phraseology" or consist of equivocal statements are improper and insufficient to deny defendant's statements). Other responses state that Plaintiffs "are not in possession of evidence sufficient to admit or deny" the paragraph, (*see, e.g.*, Ps' 56.1 Resp. ¶¶ 79, 86-87, 134-35), which is also insufficient, *see Guzman v. Crothall Healthcare Inc.*, No. 17-CV-4306, 2021 WL 5048993, at *3 n.15 (E.D.N.Y. Sept. 29, 2021) (deeming statement admitted where plaintiff denied knowledge or information sufficient to admit or deny statement but did not materially dispute statement); *McChriston v. Diversified Consultants, Inc.*, No. 18-CV-185, 2019 WL 4418580, at *3 (S.D.N.Y. June 7, 2019) ("Where the party opposing summary judgment merely states that he cannot confirm a fact set forth in the moving party's Rule 56.1 statement, that fact is deemed admitted."). Accordingly, any of Defendant's 56.1 statements, or any portion thereof, that are properly supported and that Plaintiffs do not specifically deny with evidence are deemed admitted for purposes of this motion. *See Universal Calvary Church v. City of N.Y.*, No. 96-CV-4606, 2000 WL 1745048, at *2 n.5 (S.D.N.Y. Nov. 28, 2000).

2

Defendant IBM is organized into functional businesses, with each receiving support from shared services organizations including human resources ("HR").  (D's 56.1 Stmt. ¶ 1.)  IBM employs HR partners ("HRP"s), who are generalists responsible for consulting with managers and others on matters such as executing reductions in force (known in IBM as "resource actions"), improving organizational effectiveness to accelerate business growth, and executing HR programs to create business value.  (*Id.* ¶¶ 2, 4, 8.)  The majority of IBM's HRPs report to the centralized HR Partner Organization, while others report to the HR Business Unit Leaders and provide dedicated support for senior leaders in those units.  (*Id.* ¶¶ 2-3.)  Prior to May 2023, IBM had three types of HRPs:  (1) Business Unit HRPs or Business Unit Leaders, who supported a specific business unit; (2) Upline HRPs, who provided support to an assigned group of upline managers (who had two or more layers of reporting employees); and (3) AskHR Partners, who received requests for support that were escalated from initial questions posed to an automated digital assistant called AskHR.  (*Id.* ¶¶ 5, 19.)  IBM's HR organization engages in periodic improvement initiatives as part of what it refers to as the "HR Transformation," which is meant to implement strategies, including the use of technology, to make HR more efficient for internal clients.  (*Id.* ¶¶ 45-46.)  IBM introduced the AskHR digital assistant in 2017 as part of the HR Transformation.  (*Id.* ¶ 47.)

Plaintiff Patricia Onken worked for IBM for over twenty-six years, (*id.* ¶ 28), and in 2013, she became an HRP Manager, serving as an Upline HRP and also managing other HRPs, (*id.* ¶¶ 29-30).  She performed in this role until she was terminated as part of a resource action in May 2023.  (*Id.* ¶ 29.)  She was sixty-six years old at that time.  (*Id.* ¶ 27.)

Plaintiff Pamela Wimbish began working for IBM as an HRP in August 2003.  (*Id.* ¶ 16.)  In May 2015, she was promoted to Senior Strategic HRP.  (*Id.* ¶ 17.)  In that role, Wimbish

served as an Upline HRP, providing support to upline managers in IBM Consulting.  (*Id.* ¶ 18.)
Plaintiff Onken also asked Wimbish to step in as the Employee and Labor Relations focal for
HRPs servicing managers in IBM Consulting.  (*Id.* ¶ 20.)  As part of the May 2023 resource
action, IBM terminated Wimbish's employment.  (*Id.* ¶¶ 15, 22.)  She was sixty-one years old at
that time.  (*Id.* ¶ 15.)

During their employment, Plaintiffs had assisted in IBM resource actions by advising and
supporting managers responsible for identifying employees for termination.  (Ps' Add. Stmt.
¶¶ 1-3.)  Prior to any resource action, certain participating managers were required to complete
training on IBM's policies and methodologies for resource actions.  (*Id.* ¶¶ 4-5; D's Add. Stmt.
Resp. ¶ 4.)  Plaintiffs contend that all those participating, including HRPs, had to complete the
training as well, but Wimbish admits she did not always receive this training.  (Ps' Add. Stmt.
¶¶ 4-5; *compare* ECF No. 87 ("Wimbish Decl.") ¶ 4, *and* ECF No. 89 ("Onken Decl.") ¶ 6, *with*
ECF No. 69-13 ("Wimbish Depo.") at 139:21-141:10.)  The methodologies for resource actions
were set forth in the U.S. Resource Action Manager Identification Training and differed
depending on whether the action involved staff reductions, position eliminations or work
eliminations. (Ps' Add. Stmt. ¶¶ 12-13.)  Plaintiffs contend that generally managers would
define a "job group" consisting of employees eligible for selection, and that those individuals
would have interchangeable skills and perform the same job responsibilities.  (*Id.* ¶¶ 15-16.)  Job
groups were not supposed to combine managers and non-managers, and only two consecutive
job bands were to be included in the same job group.  (*Id.* ¶¶ 17-18.)[2]  Plaintiffs also contend that
the managers in charge of selecting the employees to be terminated in a resource action were
required to use multiple objective job-related criteria, (*id.* ¶¶ 20-21), but Defendant disputes that

---

[2] A "job band" is IBM's job level scale.  (D's 56.1 Stmt. ¶ 89.)

4

the criteria had to be "objective," (D's Add. Stmt. Resp. ¶¶ 20-21; *see* ECF No. 85-1 at 04322).

Managers were then supposed to undertake a comparative analysis of the employees in a job

group by ranking them using the chosen criteria and reaching an overall assessment of high,

medium or low for each employee.  (Ps' Add. Stmt. ¶ 22; ECF No. 85-1 at 04322.)  Plaintiffs

further contend that managers were required to ensure that decisions were consistent with

employee records, but Defendant contends that that practice was only recommended.  (Ps' Add.

Stmt. ¶ 23; ECF No. 85-1 at 04345; *see* D's Add. Stmt. Resp. ¶ 23.)  The parties dispute whether

the comparative analysis of the people in the job group was required to be performed by the

employees' immediate supervisor.  (Ps' Add. Stmt. ¶ 25; D's Add. Stmt. Resp. ¶ 25.)  Defendant

also disputes that the process Plaintiffs describe for resource actions was required in all instances

without exception.  (D's Add. Stmt. Resp. ¶¶ 15-18, 22.)

HRPs were available to provide advice and counsel during the process.  (Ps' Add. Stmt.

¶ 28; D's Add. Stmt. Resp. ¶ 28; ECF No. 85-1 at 04318.)  In their experience as HRPs assisting

with resource actions, Plaintiffs ensured managers used objective criteria to make selection

decisions and had the documentation to support their choices.  (Ps' Add. Stmt. ¶ 27; Wimbish

Depo. at 134:20-135:14; D's Add. Stmt. Resp. ¶ 27.)  The parties dispute whether ███████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████.  (Ps' Add. Stmt. ¶¶ 31-32; D's Add.

Stmt. Resp. ¶¶ 31-32.)  The parties agree that ████████████████████████████████

██████████████████████████.  (Ps' Add. Stmt. ¶ 33; D's Add. Stmt. Resp. ¶ 33.)

Aside from their own terminations, Plaintiffs never observed selection decisions that they

believe were based on age, but Wimbish testified that on a few occasions a manager suggested

an employee for a resource action because he or she was expected to retire, and Wimbish successfully counseled against that fact being considered.  (*See* D's 56.1 Stmt. ¶ 22; Ps' 56.1 Resp. ¶ 22; Wimbish Depo. at 142:22-151:13.)  Wimbish never heard any IBM employee make a derogatory comment about older workers; was not aware of any resource selection decision being made based on age or professional "runway," *i.e.*, an employee's proximity to retirement; and never heard the terms "new skills" or "new energy" used at IBM to refer to younger workers. (D's 56.1 Stmt. ¶¶ 24-26.)[3]  Onken never heard HR personnel talk about age in the context of a resource action, stated that it was a forbidden subject, was unaware of any resource action selection decision that she believed was made on an improper basis, and had not heard anyone at IBM use the term "runway" to refer to age since 2013.  (*Id.* ¶¶ 36-43.)

In November 2021, IBM spun off its Global Technology Services business, resulting in approximately 90,000 employees exiting IBM to become part of the new company.  (*Id.* ¶ 48.) With that large reduction in the number of employees, shared-service functions like HR were oversized, and these organizations were challenged to reduce their expenses by ███████, with the HRP organization specifically challenged to reduce its budget by ████████████ in 2023. (*Id.* ¶¶ 49-50.)  To address the issue and as part of the HR Transformation, IBM created a new HRP Organization that would use a "New HR Model" that would reduce the number of managers who would have dedicated HR support.  (*Id.* ¶¶ 51-52.)  The New HR Model would have upline managers with comparatively small organizations first consult the AskHR digital assistant before receiving assistance from an HRP.  (*Id.* ¶ 52.)  As a result, ████████████ of upline managers would no longer have dedicated support from an HRP like Wimbish or Onken.

---

[3] Plaintiffs' Complaint and Amended Complaint alleged that these terms, especially "runway," were commonly used at IBM as euphemisms for age.  (ECF No. 1 ¶¶ 36-38; ECF No. 47 ¶¶ 36-38.)

(*Id.* ¶ 53.)  Instead, the New HR Model would include four types of HRPs:  (1) Business Unit HRPs, who would provide dedicated support to managers with large organizations and report to business unit leadership; (2) Team HRPs, who would be part of the expanded pool of HRPs behind the AskHR digital assistant; (3) Market HRPs, who would be the primary leads for a national market; and (4) Client HRPs, who would support the upline managers who remained eligible for support from a designated HRP.  (*Id.* ¶ 61.)  Defendant asserts that these roles were new and replaced the prior HRP roles, but Plaintiffs contend that at least some of the positions were conceptually the same as in the prior HR model.  (*Compare* D's 56.1 Stmt. ¶ 60, *with* Ps' 56.1 Resp. ¶ 60.)  In any event, under the New HR Model, the HRP Organization required far fewer HRPs.  (D's 56.1 Stmt. ¶ 54.)

As a result of this change, in early 2023 IBM's new HR Vice President for the Global HR Partner Organization, Carol Gordon, was directed to reduce the headcount of the U.S. HRP population by thirty-eight employees (the "2023 Resource Action").  (*Id.* ¶¶ 6, 8, 62-63; Ps' Add. Stmt. ¶ 38.)  Gordon was tasked with determining which HRPs would be terminated and which would fill new roles in the New HR Model.  (D's 56.1 Stmt. ¶¶ 8, 64.)  She had to do this on a "very tight timeline."  (Ps' Add. Stmt. ¶ 41.)  Gordon made selections in close consultation with Dina McDonald, the HR Leader for the U.S. Market.  (D's 56.1 Stmt. ¶¶ 9, 11, 65.)  Throughout the process, Debra Adams, the HR Partner for the HR Organization, served in an advisory capacity.  (*Id.* ¶¶ 13-14.)  Adams's role was to make sure individuals were being fairly assessed, but Plaintiffs contend that Adams also provided her own opinion about whether specific individuals should be selected for termination.  (*Id.* ¶ 14; Ps' 56.1 Resp. ¶ 14.)  Before making her selections, Gordon did not review IBM's methodologies for staff reduction resource actions.  (Ps' Add. Stmt. ¶ 44.)

Gordon identified seventy-nine HRPs who were eligible to be selected in the 2023 Resource Action.  (D's 56.1 Stmt. ¶¶ 67-68.)  They were in four or five job bands and included HRPs with different roles and responsibilities.  (Ps' Add. Stmt. ¶¶ 57-58; D's Add. Stmt. Resp. ¶ 57.)  Gordon then requested and received from Adams information about those employees, including their "Checkpoints," which were IBM's performance evaluations, for the previous three years; "Learning Completion" scores, which showed whether eligible HRPs had completed their established learning plans; "Your Insights" scores, which revealed the extent to which the HRPs accessed the "data dashboards" reflecting information regarding talent, trends and other HR-related metrics, which were designed to assist HRPs in being analytical; and the HRPs' locations and leadership responsibilities.  (D's 56.1 Stmt. ¶ 72.)

On February 22, 2023, at 9:21 p.m., Gordon scheduled a meeting with HR leaders for the following morning to get their feedback on the eligible HRPs.  (*Id.* ¶ 73; Ps' 56.1 Resp. ¶ 73.)  When she scheduled the meeting, Gordon sent the attendees the list of eligible HRPs and a PowerPoint with information about the New HR Model, including new HRP coverage principles, desired HRP skills, and the redefined roles and responsibilities for the new types of HRPs, and instructed the attendees to come prepared with assessments of the eligible HRPs' performance and skills on a high/medium/low scale and on overall fit for the New HR Model roles.  (D's 56.1 Stmt. ¶ 74; ECF No. 69-21.)  Gordon did not share with the attendees the information she had requested from Adams, including the HRPs' Checkpoints, Learning Completion scores, or Your Insights scores, (Ps' 56.1 Resp. ¶ 72), and she did not provide guidance as to how the attendees should apply any of these scores to their assessments, (Ps' Add. Stmt. ¶¶ 62-63).  Before the meeting, Gordon completed IBM's required age discrimination training, (*id.* ¶ 81), but she did not conduct any review of whether the process complied with age discrimination laws, (*id.* ¶ 80).

The meeting attendees included leaders from the HR organization including Gordon; McDonald; Adams; and Pilar Pons, the Vice President of EMEA Markets and Global Leader for the Client and Team HR Partners, (D's 56.1 Stmt. ¶¶ 12, 75), as well as HR executives Brenda Swatek, Varun Gupta, Tom Fleming, and Kevin Kubicki, (id. ¶ 75). Many of the HR executives knew the upline HRPs well, and Gupta, Kunicki, and Swatek collectively served as first-level managers to nine of the eligible HRPs. (Id. ¶¶ 75-76.) McDonald also directly supervised Onken, supervised Wimbish's direct report, and was the first or second-level manager to roughly two-thirds of the group. (Id. ¶¶ 10, 82.) At the meeting, the attendees shared their knowledge about the eligible HRPs, (id. ¶ 77), but did not perform a skill-by-skill assessment and were not required to each provide high/medium/low assessments as to every HRP, (Ps' Add. Stmt. ¶¶ 65-66; D's Add. Stmt. Resp. ¶ 66), nor did they create a formal ranking of high/medium/low for skills, performance, and fit, (Ps' Add. Stmt. ¶ 73; D's Add. Stmt. Resp. ¶ 73). The attendees did not discuss the ages or proximity to retirement of any eligible HRP. (D's 56.1 Stmt. ¶ 79.)

Following the meeting, McDonald sought additional feedback about some of the eligible HRPs. (D's 56.1 Stmt. ¶ 80; Ps' 56.1 Resp. ¶ 80.) Gordon, McDonald, Adams, and Pons then met to make their initial selection decisions. (Ps' Add. Stmt. ¶ 74.) Based on the attendees' feedback and information provided by Gordon and McDonald, Adams created a spreadsheet that placed the eligible HRPs into "top," "core," and "bottom" categories, (D's 56.1 Stmt. ¶ 78; ECF No. 69-12 ("Adams Depo.") at 113:7-19, 107:20-109:5), and entered the high/medium/low rankings, (Ps' Add. Stmt. ¶ 84; D's Add. Stmt. Resp. ¶ 84). The parties dispute to what extent Gordon was involved and upon which materials the decision-makers relied in making selection decisions at the meeting. (D's 56.1 Stmt. ¶ 81; Ps' 56.1 Resp. ¶ 81; Ps' Add. Stmt. ¶ 76.) Defendant alleges Gordon and McDonald made their decision jointly and relied upon feedback

9

from the assessment meeting; the additional feedback solicited by McDonald; the HRPs' prior three years of Checkpoint reviews; the HRPs' Learning Completion scores and Your Insights scores for 2022; and their own personal experience with the HRPs. (D's 56.1 Stmt. ¶ 81.) Plaintiffs contend that Gordon made the decisions based on McDonald's assessment and did not express any opinions of her own, and that they did not use the Learning Completion scores or review certain HRPs' Checkpoint reviews to make selection decisions. (Ps' 56.1 Resp. ¶ 81; Ps' Add. Stmt. ¶¶ 76-77.) The parties also dispute the level of familiarity McDonald had with eligible HRPs' Checkpoint reviews. (D's 56.1 Stmt. ¶¶ 82-83; Ps' 56.1 Resp. ¶¶ 82-83.)

Additionally, although Defendant maintains that Gordon and McDonald made their selections based on their assessments of each HRP's skills, performance, and fit for the New HR Model, (D's 56.1 Stmt. ¶ 88), Plaintiffs argue that the HRPs that IBM chose to retain had lower "skills" ratings than Plaintiffs, (Ps' 56.1 Resp. ¶ 88). The parties agree, however, that Gordon and McDonald did not consider an employee's job band or status as a managerial employee when making their selections. (D's 56.1 Stmt. ¶ 89; Ps' Add. Stmt. ¶ 69.) This was not typical for resource actions at IBM, but Defendant asserts that it is explained by the fact that the 2023 Resource Action was not traditional because a new organization with considerably different roles was being created and because of the deadlines that had been set. (D's 56.1 Stmt. ¶ 90; Ps' Add. Stmt. ¶ 46; D's Add. Stmt. Resp. ¶ 46.)

Gordon and McDonald finalized their selections in March 2023. (D's 56.1 Stmt. ¶ 92.) At that time, Gordon was fifty-eight years old and McDonald was thirty-nine years old. (D's 56.1 Stmt. ¶ 6; Ps' Add. Stmt. ¶ 92.) They rated Wimbish as "Bottom" (out of the top, core, and bottom options), because, McDonald contends, Wimbish (1) was not innovative or transformative and instead followed "the playbook for what was set"; (2) did not proactively

10

bring forward recommendations to improve processes or make them more efficient; (3) performed poorly as the Employee and Labor Relations focal for Consulting HRPs by providing inaccurate guidance; (4) proactively brought cases to McDonald for discussion on only a few occasions; (5) continued to engage in administrative rather than strategic or transformational work; and (6) had a Learning Completion score of 0 in 2022.  (D's 56.1 Stmt. ¶¶ 93-101.) Plaintiffs dispute this characterization of Wimbish, arguing that Wimbish was praised in her 2022 Checkpoint review as "always driving for improvements in offerings and processes," and received other positive reviews in 2021 and 2022.  (Ps' 56.1 Resp. ¶¶ 94-96.)  Plaintiffs do not dispute that Wimbish received a Learning Completion score of 0 but note that other younger HRPs not selected for termination did not complete their Learning Plan requirements either.  (*Id.* ¶ 101.)[4]  Wimbish was terminated effective May 31, 2023.  (D's 56.1 Stmt. ¶ 102.)

Gordon and McDonald also rated Onken as "Bottom," because, McDonald contends, Onken (1) was resistant to directives to integrate new technology and programs into her day-to-day work and had gaps in her ability to use technology masterfully; (2) was not focused on scanning the external market to understand what peer competitors were doing; (3) struggled with holding subordinate HRPs accountable; (4) was resistant to client work and instead focused on people management, which would not be part of the New HR Model; (5) did not pursue additional learning opportunities within IBM; (6) was described as not "strategic" but rather "very passive" in her partnership style; (7) was inappropriately protective of her direct reports; and (8) had previously received lower skills ratings.  (*Id.* ¶¶ 107-18.)  Plaintiffs dispute this characterization of Onken, alleging that Onken received praise in prior Checkpoint reviews for

---

[4] The younger individuals to whom Plaintiffs point, however, completed half of their requirements, whereas Wimbish completed none.  (*See* ECF No. 69-20 ("Ex. Q"), Column AJ; ECF No. 69-3.)

her innovation and pursuit of opportunities for automation, attended several external HR events, exceeded expectations on client success, and demonstrated resourcefulness.  (Ps' 56.1 Resp. ¶¶ 107-15.)  Plaintiffs do not dispute that Onken received lower skills ratings, including a "Successful" or middle-tier rating in 2022 and an "Expects More" or low-tier rating in 2021.  (*Id.* ¶ 118.)  Onken was terminated effective May 2023.  (D's 56.1 Stmt. ¶ 119.)

Those who were not selected for termination ranged in age from thirty to sixty-nine years old.  (*Id.* ¶ 121.)  One sixty-seven-year-old HRP who was not selected was described at the assessment meeting as being ██████████████ and ██████████████ in her role.  (*Id.* ¶ 123.) McDonald also described this individual as being proactive in scanning the external environment to understand best practices and competitor strategies and in developing strategies to help the business operate in a more automated fashion.  (*Id.*)  This individual, and a sixty-three-year-old HRP who was not selected for termination, had, in Wimbish's view, qualifications that were "very similar" to hers.  (*Id.* ¶¶ 124-25.)  Another eligible HRP who was retained and assumed some of Wimbish's responsibilities but whom Wimbish believed had lesser qualifications was fifty-two years old.  (*Id.* ¶¶ 127-29; Wimbish Depo. at 215:4-217:15.)  Onken's functions were assumed by multiple HRPs who had been eligible but not selected for termination, including one who was fifty-six years old.  (D's 56.1 Stmt. ¶ 132.)  These remaining HRPs were placed into one of three new roles:  Business Unit HRP, Client HRP, and Team HRP.  (*Id.* ¶ 133.) Following the implementation of the New HR Model, IBM has continued to automate HR functions with technology, resulting in cost savings.  (*Id.* ¶¶ 134-35.)

**B.**     **Procedural History**

Plaintiffs filed their initial complaint on September 20, 2023, asserting claims against Defendant for age discrimination in violation of the Age Discrimination in Employment Act

12

("ADEA") on behalf of both Plaintiffs, age discrimination in violation of the New York State Human Rights Law ("NYSHRL") on behalf of Wimbish, and age discrimination in violation of the Atlanta Fair Private Employment Act ("AFPEA") on behalf of Onken.  (*See* ECF No. 1.)  On November 17, 2023, Defendant filed its Answer, (ECF No. 16), and the Court held an initial conference setting a discovery schedule on January 9, 2024, (*see* Minute Entry dated Jan. 9, 2024; ECF No. 21).

On September 5, 2024, Plaintiffs filed a pre-motion letter in anticipation of their motion to amend the complaint to add disparate impact claims under the ADEA and NYSHRL.  (ECF No. 30.)  Defendant responded to Plaintiffs' letter, indicating it opposed Plaintiffs' proposed amendment, (ECF No. 37), and the Court held a pre-motion conference on September 25, 2024 at which it set a briefing schedule on the motion to amend, (*see* Minute Entry dated Sept. 25, 2024).  On January 10, 2025, Plaintiffs filed their motion to amend, (ECF No. 43), along with a letter informing the Court that Defendant would not oppose it, (ECF No. 42).  The Court granted the motion on January 13, 2025.  (ECF No. 46.)  On January 17, 2025, Plaintiffs filed their amended complaint, adding claims for disparate impact age discrimination on behalf of both Wimbish and Onken under the ADEA and on behalf of Wimbish under the NYSHRL.  (ECF No. 47 ("AC").)  Defendant filed its Answer to the AC on February 14, 2025.  (ECF No. 50.)

On May 13, 2025, after the close of fact and expert discovery, Defendant filed a pre-motion letter in anticipation of its motion for summary judgment.  (ECF No. 55.)  The Court held a pre-motion conference on June 24, 2025, at which it set a briefing schedule for Defendant's motion.  (*See* Minute Entry dated June 24, 2025.)  The instant motion followed.  (ECF No. 67.)[5]

---

[5] On December 18, 2025, the same day Defendant filed its motion, the parties wrote jointly to the Court to request leave to file certain documents under seal.  (ECF No. 68.)  The Court granted the motion to seal the following day.  (ECF No. 95.)

## II.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255; *see Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) ("When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor.").  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir. 1996).

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

14

475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1).  Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  "If a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

## III.    DISCUSSION

### A.    ADEA – Disparate Treatment

Under the ADEA, it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ."  29 U.S.C. § 623(a)(1).  "The ADEA's prohibitions protect employees who are at least forty years of age." *Elliott v. Avangrid Mgmt. Co.*, No. 23-CV-879, 2025 WL 2300760, at *6 (D. Conn. Aug. 8, 2025), *appeal filed*, No. 25-2102 (2d Cir. Sept. 2, 2025).  Plaintiffs assert discrimination claims

under the ADEA based on two theories:  (1) disparate treatment and (2) disparate impact.  The Court analyzes each theory separately and begins with Plaintiffs' disparate treatment claim.

Such claims are assessed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Tillman v. Grenadier Realty Corp.*, No. 24-2325, 2025 WL 2910611, at *1 (2d Cir. Oct. 14, 2025) (summary order).  To establish a *prima facie* case of disparate treatment, a plaintiff must demonstrate that:  "(1) she belongs to a protected class; (2) she was performing satisfactorily; (3) she was discharged; and (4) the decision to discharge occurred under circumstances giving rise to an inference of discrimination based on her membership in the protected class."  *Duncan v. N.Y.C. Transit Auth.*, 127 F. Supp. 2d 354, 362 (E.D.N.Y. 2001), *on reconsideration*, No. 97-CV-4651, 2001 WL 1286786 (E.D.N.Y. Oct. 19, 2001), *aff'd*, 45 F. App'x 14 (2d Cir. 2002); *see Allen v. City of N.Y.*, No. 19-CV-3786, 2024 WL 3965697, at *6 (S.D.N.Y. Aug. 28, 2024), *aff'd*, No. 24-2589, 2025 WL 3152723 (2d Cir. Nov. 12, 2025) (summary order).  "Plaintiff's burden of proof at this stage of the analysis has been characterized as 'minimal' and '*de minimis*,' but it is not non-existent."  *Wellesley v. Debevoise & Plimpton LLP*, No. 06-CV-3518, 2008 WL 11417176, at *4 (E.D.N.Y. Feb. 20, 2008), *aff'd*, 346 F. App'x 662 (2d Cir. 2009) (summary order).  If the plaintiff establishes a *prima facie* case of age discrimination, the burden shifts to the defendant to present a legitimate, non-discriminatory explanation for its decision.  *See Elliott*, 2025 WL 2300760, at *7.  "This burden is one of production, not persuasion . . . ."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  If such an explanation is presented, then the plaintiff must present evidence that the employer's explanation is pretextual.  *See Duckett v. Foxx*, 672 F. App'x 45, 47 (2d Cir. 2016) (summary order).  "A reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the

16

real reason." *Velez v. Town of Stratford*, No. 18-CV-1053, 2020 WL 1083625, at *10 (D. Conn. Mar. 6, 2020) (emphases in original). "To establish that the real reason for [a plaintiff's] termination was age discrimination, a plaintiff must show age was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor." *Parron v. Herbert*, No. 17-CV-3848, 2018 WL 2538221, at *7 (S.D.N.Y. May 18, 2018), *aff'd*, 768 F. App'x 75 (2d Cir. 2019) (summary order).

### 1. *Prima Facie* Case

Defendant argues that Plaintiffs cannot make out a *prima facie* case of discrimination because they cannot establish that their selection in the 2023 Resource Action occurred under circumstances giving rise to an inference of discrimination. (ECF No. 70 ("D's Mem.") at 9-12.) Plaintiffs argue that they have presented enough evidence, including statistical evidence and evidence that they were treated less favorably than similarly situated younger HRPs, to meet their minimal burden on summary judgment. (ECF No. 79 ("Ps' Opp.") at 9-15.)

"A showing of disparate treatment – that is, a showing that the employer treated plaintiff[s] less favorably than a similarly situated employee outside [their] protected group – is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). "[A]lleged comparators must be similarly situated to the plaintiff[s] in all material respects. What constitutes all material respects varies from case to case, but the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of the plaintiff[s'] and comparator's cases." *Satina v. City of N.Y.*, No. 24-CV-1842, 2026 WL 480516, at *3 (S.D.N.Y. Feb. 20, 2026). "Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury," *Mandell*, 316 F.3d at 379, but "a court can properly grant summary

judgment where it is clear that no reasonable jury could find the similarly situated prong met," *Wallen v. Teknavo Grp.*, No. 12-CV-6196, 2019 WL 1435879, at \*16 (E.D.N.Y. Mar. 30, 2019).

Plaintiffs point to three younger individuals they assert were similarly situated to Onken but were not selected for termination, (Ps' Opp. at 11), and four younger individuals (two of whom are listed for Onken) they assert were similarly situated to Wimbish but were not selected for termination, (*id.* at 12). Plaintiffs argue that these comparators are similarly situated because they were all subject to the same uniformly applicable selection process and assessed by the same criteria, of which a crucial component was their "skills." (*Id.* at 9-10.) Defendant argues that the proposed comparators are not similarly situated to Plaintiffs in all material respects because they had better scores than Plaintiffs in areas other than "skills" that Defendant considered when assessing the eligible HRPs. (ECF No. 91 ("D's Reply") at 2.)

As an initial matter, only one of the individuals to whom Plaintiffs point in their opposition is younger than forty years old. (*See* Ps' Opp. at 11-12 (listing as comparators individuals who were 29, 43, 44, 50 and 55).) Some courts have held that only those who are outside the protected group (of forty years or older) are relevant comparators. *See Bahnsen v. Town of Brookhaven*, No. 17-CV-4545, 2019 WL 7475951, at \*7 (E.D.N.Y. Dec. 16, 2019) ("To raise an inference of discrimination, an ADEA plaintiff must show that he was treated less favorably than a similarly situated employee *outside of the protected group*.") (emphasis added), *report and recommendation adopted*, 2020 WL 42757 (E.D.N.Y. Jan. 3, 2020); *cf. Hess v. Mid Hudson Valley Staffco LLC*, No. 16-CV-1166, 2018 WL 4168976, at \*17 (S.D.N.Y. Aug. 30, 2018) (that plaintiff was replaced by someone fifteen years younger did not support claim where latter individual was fifty-five and thus still in protected class under ADEA), *aff'd*, 776 F. App'x 36 (2d Cir. 2019) (summary order). But other courts have found that a plaintiff may raise an

18

inference of discrimination by showing that those in the protected class but substantially younger were treated more favorably. *See Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 24 (E.D.N.Y. 2015) ("[A]lthough [the proposed comparator's] membership in the protected class could undercut an inference of discrimination, at fourteen years younger than Plaintiff, she was still substantially younger, which supports the inference.") (collecting cases).  Thus, I consider all individuals listed by Plaintiffs in their opposition.  The parties have also presented evidence that there were eight other individuals under forty who were not terminated, (*see* Ex. Q; ECF No. 69-25 ("Ex. V") at 5-8), and the Court has considered those individuals as well.[6]

Although Plaintiffs argue that these individuals are similarly situated to Plaintiffs because they were all eligible for termination and compared against one another, "the mere fact that [Defendant] actually compared [Plaintiffs] and [the other HRPs] does not render them similarly-situated." *Riley v. UOP LLC.*, 244 F. Supp. 2d 928, 943 (N.D. Ill. 2003).  Rather, the comparators must be "similar enough to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, so as to isolate the critical independent variable:  [age]." *Filar v. Bd. of Educ.*, 526 F.3d 1054, 1061 (7th Cir. 2008).  Defendant argues that Plaintiffs are not similar enough in all material respects because none of the proposed comparators have exactly the same scores in all categories as Plaintiffs.  But one of the proposed comparators received the same scores as Wimbish in each category except for three in which in that person's were one level lower and except for Learning Completion, which that person

---

[6] Exhibit V, (ECF No. 69-25), lists a total of twelve individuals under forty not selected for termination, including the one Plaintiffs identify as a proposed comparator, (*see* Ps' Opp. at 11-12), and the eight individuals the Court has stated it will also consider.  Also included in that total are three individuals for whom the parties did not provide scores and ratings, and accordingly the Court is not able to consider those individuals as comparators.

achieved.  (*Compare* Ex. Q, Row 11, *with* Ex. Q, Row 34.)[7]  A reasonable jury could find that these two were similarly situated, despite the differences Defendant identifies between Plaintiffs and the proposed comparators.  (*See* D's Reply at 2 (arguing no proposed comparator in Exhibit Q had Learning Completion Score of 0).)  *See Ehrbar*, 131 F. Supp. 3d at 23 (differences identified by defendants would not preclude reasonable jury from finding plaintiff and proposed comparator were similarly situated); *cf. Xiang v. Eagle Enters., LLC*, No. 19-CV-1752, 2022 WL 785055, at *17 (S.D.N.Y. Mar. 15, 2022) (no evidence that termination was pretextual where defendants provided evidence that multiple other individuals with performance ratings similar to plaintiff were also terminated); *Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 399-400 (E.D.N.Y. 2008) (no evidence that employees were similarly situated where co-workers were not performing poorly and plaintiff suggested they performed better than he).

Additionally, this individual received a score of "High" in both performance and skills, while Wimbish received a score of "Medium" in both categories, but these scores appear to be inconsistent with the scores received in their Checkpoint reviews, in which Wimbish received the same or higher ratings than this individual.  (*Compare* Ex. Q, Row 11, *with* Ex. Q, Row 34.)  This discrepancy also supports an inference of discrimination.  *Cf. Vernon v. Port Auth. of N.Y. & N.J.*, 154 F. Supp. 2d 844, 855 (S.D.N.Y. 2001) (plaintiff could satisfy final prong of *prima facie* case where he received scores consistently above average for years but was then

---

[7] Under the category of "Top 3 Locations," Wimbish was listed as "no" and the comparator was listed as "yes."  (*Compare* Ex. Q, Row 11, Column V, *with* Ex. Q, Row 34, Column V.)  According to Gordon, this indicated that the comparator was located at or near an IBM strategic hub, while Wimbish was not.  While IBM wanted more resources near IBM clients or other employees, location was only used as a tiebreaker toward the end of the process.  (*See* ECF No. 69-9 ("Gordon Depo.") at 46:15-47:8, 93:13-25, 94:9-24.)  There is no indication that location affected the decisions as to either Plaintiff.

downgraded and heard for first time about performance deficiencies not recorded in performance review).

As for Plaintiff Onken, she also received similar scores in various categories as the individual the Court just compared to Wimbish.  (*Compare* Ex. Q, Row 9, *with* Ex. Q, Row 34.)  Although she received lower scores than this individual in some categories, she received higher scores in others.  (*Id.*)  She also, unlike Wimbish, had the same Learning Completion score as this individual.  (*Id.*)[8]  Nevertheless, Gordon and McDonald ranked her Performance and Skills as "Low," and this individual's as "High."  (*Id.*)  Thus, as with Wimbish, a reasonable jury could find that Onken and this individual were similarly situated, supporting an inference of discrimination.

Thus, even without considering the disputed statistical evidence to which Plaintiffs point and which I discuss below, Plaintiffs have met their minimal burden to make out a *prima facie* case of discrimination.  The arguments Defendant raises with respect to evidence that undermines this inference of discrimination is better addressed at the pretext stage.  *See Ehrbar*, 131 F. Supp. 3d at 24.

### 2.	Legitimate, Non-Discriminatory Reasons for Selection

I next consider whether Defendant has offered a legitimate, non-discriminatory reason for selecting Plaintiffs in the 2023 Resource Action.  "[A] defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (emphasis in original).  The

---

[8] Onken was also listed as not being in one of the "Top 3 Locations."  (*Compare* Ex. Q, Row 9, Column V, *with* Ex. Q, Row 34, Column V.)

employer's burden at this stage is "not a particularly steep hurdle." *Nguyen v. Dep't of Corr. & Cmty. Servs.*, 169 F. Supp. 3d 375, 392 (S.D.N.Y. 2016).

Although Defendant first argues that the reduction in force was not initiated for a discriminatory purpose, (D's Mem. at 12), whether Defendant had legitimate reasons for the resource action is not the issue here. The question is whether Plaintiffs were selected for termination during the 2023 Resource Action because of intentional discrimination. *See Kelley v. Sun Microsystems, Inc.*, 520 F. Supp. 2d 388, 399 (D. Conn. 2007). But Defendant has also articulated a legitimate, non-discriminatory reason for selecting Plaintiffs for termination. Defendant alleges it terminated Plaintiffs after a "holistic, robust, and well-documented process that considered which HRPs would perform best in the New HR Model by focusing on HRP skills, performance, and fit for that Model." (D's Mem. at 12.) Defendant alleges that after completing that process, Gordon and McDonald decided that Plaintiffs should be terminated for the following reasons: (1) Wimbish was not proactive in improving processes; (2) Wimbish was performing administrative tasks for her clients as opposed to strategic work; (3) Wimbish performed poorly as an Employee and Labor Relations focal based on escalations from several individuals; (4) Onken had "gaps" with using specific technologies; (5) Onken failed to hold a subordinate accountable; (6) Onken was resistant to client work as opposed to people management at a time when IBM was eliminating people manager roles. (D's Reply at 4.)

Courts have found similar reasons to be sufficient to satisfy the defendant's burden at the second stage of the *McDonnell Douglas* test. *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014) (defendant satisfied burden at second step where it terminated plaintiff's employment as part of company-wide reduction in force and selected plaintiff based on his poor performance); *Stinson v. Morningstar Credit Ratings, LLC*, No. 22-CV-6164, 2024 WL

22

3848515, at *11 (S.D.N.Y. Aug. 16, 2024) (examples of legitimate, non-discriminatory reasons for adverse employment action include a plaintiff's negative performance evaluations, difficulties interacting with some colleagues, unwillingness to learn from and cooperate with coworkers, and inability to complete assignments) (collecting cases); *Sandler v. Montefiore Health Sys., Inc.*, No. 16-CV-2258, 2018 WL 4636835, at *7 (S.D.N.Y. Sept. 27, 2018) (defendants met burden at second stage where they alleged they terminated plaintiff because of poor job-related skills and abilities); *Orisek v. Am. Inst. of Aeronautics & Astronautics*, 938 F. Supp. 185, 191 (S.D.N.Y. 1996) (defendant offered legitimate, non-discriminatory reason for terminating plaintiff where they alleged plaintiff did not demonstrate skills or characteristics required of employees following company's reorganization), *aff'd*, 162 F.3d 1148 (2d Cir. 1998). Thus, Defendant's stated reasons are sufficient to meet its burden at the second stage of the *McDonnell Douglas* test, and the Court turns to whether Plaintiffs have met their third-stage burden of showing that the non-discriminatory reasons were a pretext for discrimination.

### 3.    Pretext

Plaintiffs argue that there is a genuine dispute as to whether Defendant's proffered reasons are pretextual because:  (1) IBM deviated from its typical process for resource actions; (2) Plaintiffs were disparately treated; and (3) there was a statistically significant impact on older workers resulting from the selection process.  (Ps' Opp. at 15-18.)  Defendant argues that Plaintiffs fail to show that IBM's reasons were pretextual because they ignore that younger employees were terminated and older employees were retained in the resource action, and any alleged irregularities in IBM's procedure were not the result of discriminatory intent.  (D's Reply at 3-7.)

23

"[A]n inference of pretext may arise where an employer's deviation from its procedures results in the challenged employment decision." *Samuels v. Urb. Assembly Charter Sch. for Comput. Sci.*, No. 23-CV-1379, 2025 WL 1785847, at *6 (S.D.N.Y. June 26, 2025). Here, Plaintiffs have proffered sufficient evidence to at least create a genuine issue of fact as to whether IBM deviated from the procedures usually taken in resource actions. For example, in other resource actions at IBM, managers would consider for termination a "job group" consisting of employees with interchangeable skills who performed the same job responsibilities. (ECF No. 85-1 at 04319, 04322.) Job groups were not supposed to combine managers and non-managers, and only two consecutive job bands were to be included in the same job group. (*Id.* at 04322.) But in the 2023 Resource Action, Gordon and McDonald made their decisions without considering job groups or whether the eligible HRPs were managers or non-managers, and more than two consecutive job bands were considered. (*See* Gordon Depo. at 50:8-51:7, 136:15-137:13, 150:22-151:7; Ex. Q.) And Gordon further testified that she did not follow the approach set forth in IBM's guidelines for staff reductions. (Gordon Depo. at 159:15-160:15.)

But even considering Plaintiffs' evidence of procedural deviations, "summary judgment is appropriate where whatever irregularities existed were either unrelated to discrimination or did not affect the final adverse decision." *Hiramoto v. Goddard Coll. Corp.*, 684 F. App'x 48, 50 (2d Cir. 2017) (summary order). Plaintiffs have failed to provide facts from which a reasonable jury could conclude that IBM deviated from its typical procedure because of any discriminatory intent. *See March v. First Choice Med. PLLC*, No. 17-CV-4272, 2021 WL 3006043, at *13 (E.D.N.Y. July 15, 2021) ("[T]he mere fact of a deviation from established procedure is not sufficient to show animus or pretext where the record is devoid of evidence that the procedural departure was related to the plaintiff's membership in a protected class."). They have failed to

connect the deviations to age, and they themselves acknowledge a non-discriminatory reason for the irregularities:  the tight timeline to complete the 2023 Resource Action.  (*See* Ps' Opp. at 18 ("[A] reasonable juror could conclude that IBM's admitted deviation from its own policies was . . . because it simply did not want to take the time necessary to follow them given Project Granite's calendar.").)  The evidence supports that conclusion.  (Adams Depo. at 175:13-176:3; *see* ECF No. 85-4 at 00000454-56.)  There is also evidence that IBM took a different approach because it was implementing the New HR Model, and thus this resource action was not typical for the company.  (*See* Gordon Depo. at 159:15-160:15.)

The absence of evidence that Defendant departed from its usual procedures for a discriminatory purpose makes this case unlike those in which such a deviation created a fact issue as to pretext.  For example, in *Stern v. Trustees of Columbia University*, the Court found the deviation sufficient at prong three where the white male Spanish-professor plaintiff provided evidence that, among other things, defendant first tried to bypass its promotion procedures altogether to hire a woman, the only other candidates considered for the position were female or Hispanic, the offer to a Hispanic candidate was made unusually rapidly, and decision-makers had commented that they needed more Hispanic people and that the plaintiff would not be seriously considered, even though defendant's policy stated that all candidates were to be considered using the same standards.  *See* 131 F.3d 305, 312-13 (2d Cir. 1997).  Here, unlike in *Stern*, not only is there an undisputed explanation for the procedural deviations, but there is no evidence of age-based animus on the part of any of the decision-makers or those involved in the assessment.  To the contrary, there is affirmative undisputed evidence that no one talked about or considered age or proximity to retirement in the assessment or selection meetings.  (ECF No. 74 ("Gordon Decl.") ¶¶ 16-17, 19-20, 22-23, 25-26; ECF No. 77 ("McDonald Decl.") ¶¶ 9-10, 12, 14, 16;

ECF No. 75 ("Pons Decl.") ¶¶ 10-11; ECF No. 76 ("Adams Decl.") ¶¶ 6-8.)  Although Wimbish testified that she believed that Gupta harbored age-based animus because he said she was "inflexible," (Wimbish Depo. at 198:17-201:16), not only is her opinion entirely subjective, *cf. Shalom v. Hunter Coll. of City Univ. of N.Y.*, No. 13-CV-4667, 2014 WL 3955167, at *6 (S.D.N.Y. Aug. 13, 2014) ("While [plaintiff] may have subjectively felt hurt or offended by [her supervisor's] comments or emails, her subjective feelings are insufficient to show that [the supervisor's] sex neutral statements had a discriminatory motive."), *aff'd*, 645 F. App'x 60 (2d Cir. 2016) (summary order), but Wimbish also testified that Gupta never referred to age or senior employees when he made this comment and that it was based on a specific instance in which she did not do as he asked, (*see* Wimbish Depo. at 198:17-201:16).  No reasonable juror could find based on that evidence that Gupta harbored age-based animus or that any such animus drove the deviation in procedure.

"[A]bsent other evidence of [discriminatory] animus, procedural irregularities alone are generally insufficient to establish pretext."  *Samuels*, 2025 WL 1785847, at *8; *see March*, 2021 WL 3006043, at *13; *see also Riccobono v. Crew*, No. 00-CV-5386, 2010 WL 11602749, at *10 (E.D.N.Y. Sept. 10, 2010) ("Plaintiff has no evidence pointing towards race discrimination, and the procedural irregularities do not do so by themselves.").  This is because "showing that an employer's reason for taking an adverse employment action is pretextual is not enough; a plaintiff must demonstrate that the asserted pretextual reasons were intended to mask *discrimination*."  *Parron*, 2018 WL 2538221, at *7 (emphasis in original).  And here, "the record offers no basis for a jury to infer that the . . . process was manipulated to generate a pretextual justification for discrimination in the decision [to terminate Plaintiffs]."  *See Hiramoto*, 684 F. App'x at 51-52.

26

Next, Plaintiffs argue that the evidence that they were disparately treated demonstrates pretext.  Even though this evidence was sufficient to meet Plaintiffs' minimal burden to make out a *prima facie* case, other evidence undermines the conclusion that younger employees with roughly the same scores as Plaintiffs were retained, and Plaintiffs were terminated, because of their age, rather than the other, non-discriminatory reasons Defendant proffers.  First, a review of the ages of the eligible, terminated employees compared to the eligible employees who were retained reveals that Defendant retained a number of employees in the protected class, and that all ages were affected by the reduction in force, including employees under the age of forty. (ECF No. 69-25 at 5-8.)  "[T]he fact that younger employees were dismissed along with the [P]laintiff[s] refutes rather than supports [their] claim of age discrimination."  *Chin v. ABN-AMRO N. Am., Inc.*, 463 F. Supp. 2d 294, 303 (E.D.N.Y. 2006); *see Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 561 (2d Cir. 1997) ("The record is perhaps most remarkable for the presence of affirmative evidence . . . that older and younger trainees were in fact treated the same."). Similarly, that Defendant retained employees who were within the same protected class as Plaintiffs, including some older than Plaintiffs, undermines any inference of discrimination.  *See Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, 869 F. Supp. 2d 378, 395 (S.D.N.Y. 2012) (no inference of age discrimination where retained employees were within same protected classes as plaintiff); *Pisana v. Merrill Lynch & Co.*, No. 93-CV-4541, 1995 WL 438715, at *4 (S.D.N.Y. July 24, 1995) ("[S]everal of the retained individuals were older than [Plaintiff].  This fact alone strongly suggests that the [reduction in force] was not pretextual for age discrimination.").

Similarly, Gordon, one of the two decision-makers, was fifty-eight years old at the time of the resource action, which also undermines an inference of age discrimination.  *See Zito*, 869

27

F. Supp. 2d at 395 (no inference of age discrimination where sole decision-maker was member of protected class).  Plaintiffs argue that Gordon was not really a decision-maker because she relied on McDonald's assessment when making selection decisions.  (Ps' Opp. at 13.)  But Plaintiffs mischaracterize Gordon's testimony.  Although Gordon first stated that she did not express any opinion during the final selection meeting as to whether certain individuals should be included in the resource action and that that "was ultimately [her] decision based on the assessment [McDonald] provided," (Gordon Depo. at 113:18-24), she clarified that although she relied on McDonald's input, she also relied on the input of others at the assessment meeting and that she made the final decision about whom to terminate, (*id.* at 114:20-115:2).  She even stated that she pushed McDonald on her assessments so that Gordon could feel "comfortable that [they] were making the right decisions." (*Id.* at 134:25-135:10.)  Others also characterized Gordon as the final decision-maker. (*See, e.g.*, Adams Depo. at 18:22-25.)  And although McDonald, who was under forty years old at the time, was also a decision-maker, (*see* ECF No. 69-10 ("McDonald Depo.") at 37:12-38:6 (Gordon and McDonald were decision-makers but collected input from others)), that one of the two was a member of the protected class is sufficient to weaken the inference of age discrimination, *see Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 378-79 (S.D.N.Y. 2013) (that one of two decision-makers was member of protected class undermined inference of discrimination); *Parrilla v. City of N.Y.*, No. 09-CV-8314, 2011 WL 611849, at *12 (S.D.N.Y. Feb. 16, 2011) (plaintiff failed to rebut defendant's non-discriminatory reasons for adverse action where two of three decision-makers were members of protected class).

Additionally, although there were possible inconsistencies in the ranking Plaintiffs received following the assessment meeting and Plaintiffs' past performance reviews, the explanation for such purported inconsistencies further undermines the strength of this evidence.

28

In *Orisek v. American Institute of Aeronautics & Astronautics*, the plaintiff had received her first negative performance review in seventeen years of employment on the eve of a reduction in force, which review plaintiff argued was unjustified on the merits and evidence of pretext. 938 F. Supp. at 189, 191. But the Court found that because the negative evaluation was the first following the defendant's reorganization, the evaluation was not necessarily inconsistent with past positive reviews in light of the defendant's new expectations. *See id.* at 190-91. The Court thus found that this evidence did not support a finding of pretext. *See id.* at 191. Similarly, here, Gordon and McDonald testified that the skills evaluated at the assessment meeting were those that would be required in the New HR Model, (*see* Gordon Depo. at 81:7-12; McDonald Depo. at 65:15-66:6, 78:10-14, 89:14-90:5), and that even though there was some overlap with the skills previously required, the new model would require less people management and more self-service, (McDonald Depo. at 71:17-23; *see* Gordon Depo. at 85:2-86:3). Thus, that Wimbish received a skills rating of "Medium" and Onken received a skills rating of "Low" at the assessment meeting is not necessarily inconsistent with their prior positive skills ratings in performance reviews in which the skills required for the old model had been considered. *See Orisek*, 938 F. Supp. at 191.

Plaintiffs suggest there are other inconsistencies between their performance and Defendant's characterizations of them. But several of these purported inconsistencies are not really inconsistencies at all. For example, Defendant alleges Onken was not interested in scanning the external market to learn what peer competitors were doing. (D's 56.1 Stmt. ¶ 108; *see* McDonald Depo. at 67:4-21.) Plaintiffs argue this is not true, as she had attended several external events, including one in March 2022. (*See* Ps' 56.1 Resp. ¶ 108; Onken Decl. ¶ 28.) But in one of Onken's recent performance reviews, her manager, McDonald, stated that she

would like to see Onken focus more on personal development, become more outcome-focused, and make more of an effort to understand what peer competitors were doing by becoming more active on social media and learning platforms.  (ECF No. 85-13 at 00449.)  That Onken attended one external event after receiving this feedback or had previously received an external certification does not demonstrate that she complied with McDonald's directive in the performance evaluation.  In fact, Onken testified that she only "[s]omewhat" did what was suggested and that it was "not a high priority for [her] based on the way [she] understood [her] responsibilities," (ECF No. 69-14 ("Onken Depo.") at 283:4-284:3), thus confirming McDonald's concern.  Further, Onken's own view of her performance, including whether she was making a sufficient effort to scan the external market, is insufficient to create a genuine issue of material fact.  *See Ricks v. Conde Nast Publications, Inc.*, 6 F. App'x 74, 78 (2d Cir. 2001) (summary order) ("[A]n employee's disagreement with her employer's evaluation of her performance is insufficient to establish discriminatory intent."); *Greene v. Brentwood Union Free Sch. Dist.*, 966 F. Supp. 2d 131, 164 (E.D.N.Y. 2013) ("An employee's own assessment of her work performance is insufficient to establish pretext."); *Pearson v. Lynch*, No. 10-CV-5119, 2012 WL 983546, at *6 (S.D.N.Y. Mar. 22, 2012) ("Without more, however, Plaintiff[']s disagreement with his managers' assessment of his performance simply does not evidence discriminatory intent.").

Additionally, although Onken denies that she was inflexible in addressing client requirements, citing her performance reviews that praised her work for her clients, (*see* Ps' 56.1 Resp. ¶ 113), her performance reviews were completed by McDonald, but the comment about being inflexible was made by another individual, *cf. Hollander v. Am. Cyanamid Co.*, 999 F. Supp. 252, 259 n.3 (D. Conn. 1998) (that other employees thought plaintiff had good

30

interpersonal skills does not refute evidence that supervisors felt differently).  Further, McDonald's comments in Onken's performance review were based on feedback from those clients who had provided input, (*see* ECF No. 85-13 at 00449), and it is not inconsistent for McDonald to have reported that Onken had done good work for some clients, but for another client – who may not have provided input at the time of the performance review – to have shared negative feedback about her at the assessment meeting.

Similarly, although Wimbish disputes McDonald's assessment that she was not innovative or transformative by citing to her performance reviews, (Ps' 56.1 Resp. ¶ 94), her performance review was completed by Onken, not by McDonald, (*see* ECF No. 85-10 at 00259; Onken Depo. at 299:8-19, 300:15-22).  Because the assessments were conducted by different people, the performance review does not suggest that McDonald's views of Wimbish suddenly changed or that her reasoning was pretextual.  *See Forte v. Liquidnet Holdings, Inc.*, No. 14-CV-2185, 2015 WL 5820976, at *11 (S.D.N.Y. Sept. 30, 2015) ("[D]ifferences between supervisors' reviews of an employee's performance are generally insufficient to demonstrate pretext."), *aff'd*, 675 F. App'x 21 (2d Cir. 2017); *Gutierrez v. City of N.Y.*, 756 F. Supp. 2d 491, 505 (S.D.N.Y. 2010) ("Evidence that Plaintiff . . . received some positive reviews does not demonstrate Defendants did not base their decision on negative reports they received."), *reconsideration denied*, No. 08-CV-6537, 2011 WL 7832709 (S.D.N.Y. Sept. 26, 2011).  Further, McDonald testified that her opinion of Wimbish was based on her own experiences working with her, (*see* McDonald Depo. at 111:8-13), and she provided a specific example of interactions that informed her belief that Wimbish was not as innovative or transformative as her peers, (*id.* at 111:12-114:6).  "[W]here an employer's explanation, offered in clear and specific terms, is reasonably attributable to an honest even though partially subjective evaluation of qualifications, no

inference of discrimination can be drawn. Indeed, an employer is entitled to arrive at a subjective evaluation of a candidate's suitability for a position." *Riccobono*, 2010 WL 11602749, at *9. And, again, Wimbish's own view of her performance and disagreement with McDonald's assessment is insufficient to create a genuine issue of material fact. *See Ricks*, 6 F. App'x at 78 ("[A]n employee's disagreement with her employer's evaluation of her performance is insufficient to establish discriminatory intent.").

Further, Plaintiffs do not dispute that Onken received some low skills ratings in her performance reviews, (Ps' 56.1 Resp. ¶ 118), that Onken was resistant to issuing corrective action against a subordinate, (*id.* ¶ 116), or that Wimbish received a Learning Completion score of 0, (*id.* ¶ 101), which are all reasons Defendant provided as to why Plaintiffs were fired, (*see* D's 56.1 Stmt. ¶¶ 93-101, 107-18). It is also undisputed that all eligible HRPs with a Learning Completion score of 0 were fired. (*Compare* Ex. Q, Column AJ, *with* Ex. V at 5-7.) In short, Plaintiffs do not, and cannot, dispute all of Defendant's proffered reasons for terminating them.

Moreover, even if Plaintiffs' evidence demonstrated that Defendant's proffered reasons for taking the adverse employment actions were pretextual, that does not suffice. *See Parron*, 2018 WL 2538221, at *7 (showing pretext is not enough; "a plaintiff must demonstrate that the asserted pretextual reasons were intended to mask *discrimination*") (emphasis in original); *Hollander*, 999 F. Supp. at 258-59 (evidence of some inconsistencies between defendant's proffered reasons and plaintiff's past positive performance reviews did not establish genuine dispute as to whether plaintiff was terminated because of his age, even if evidence cast doubt on defendant's articulated reasons). A plaintiff must also show that the defendant's reasons were a pretext for discrimination. *See Velez*, 2020 WL 1083625, at *10. Although the Supreme Court held in *Reeves v. Sanderson Plumbing Products, Inc.* that "it is *permissible* for the trier of fact to

32

infer the ultimate fact of discrimination from the falsity of the employer's explanation," 530 U.S. 133, 147 (2000) (emphasis in original), the Court clarified that such an inference is not always warranted, and that the appropriateness of granting judgment as a matter of law must be determined on a case-by-case basis, taking into account "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law," *id.* at 148-49.

As explained, in light of the evidence outlined above, Plaintiffs' *prima facie* case and evidence of pretext is weak, and there is simply no other evidence that Plaintiffs were selected for termination because of their age.  Plaintiffs allege that one manager wanted to select an employee for inclusion in another resource action because he was over 70 and would retire soon, (Wimbish Depo. at 143:3-145:21), but that manager was not involved in Plaintiffs' termination. Other than that incident in 2023, the most recent time Wimbish could remember someone at IBM raising age or proximity to retirement as a reason to select someone for termination was in 2016, and she could not remember who was involved in that conversation.  (*Id.* at 146:24-147-8.) Onken had not heard an age-related comment since 2013.  (D's 56.1 Stmt. ¶¶ 39-43.)  These isolated incidents are insufficient evidence of discriminatory intent because they did not involve the decision-makers here and the comments were not made in relation to the employment decision at issue.  *Cf. Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 150 (2d Cir. 2010) (alleged discriminatory comments had "little probative value" in discrimination case where they were made years before most of the events at issue by person who was not involved in any of the challenged decisions); *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 399 (S.D.N.Y. 2013) ("Stray remarks by non-decision-makers or by decision-makers unrelated

33

to the decision process are rarely given great weight, particularly if they were made temporally

remote from the date of the decision."), *aff'd*, 586 F. App'x 739 (2d Cir. 2014) (summary order).

A reasonable jury could not find from these incidents that Plaintiffs' age was a but-for cause of

their termination.

Plaintiffs also point to their statistical evidence as support that their termination was

discriminatory.  But even though there is a dispute as to whether there was a statistically

significant impact on older workers and whether that evidence is probative of discrimination –

which I discuss below –

> Plaintiff[s'] statistical analysis, standing alone, is . . . not sufficient to defeat
> summary judgment.  Although a generalized statistical analysis of selections in a
> [reduction in force] can provide circumstantial evidence of an inference
> of discrimination in support of a *prima facie* case, as a matter of law, it is not
> sufficient to establish that the Defendant's legitimate business rationale for
> eliminating Plaintiff[s'] position is false, or that [their] age . . . was the real reason
> for [their] termination.

*Zito*, 869 F. Supp. 2d at 395; *see Cruz v. Bernstein Litowitz Berger & Grossman LLP*, No. 20-

CV-8596, 2023 WL 2691456, at *9 (S.D.N.Y. Mar. 29, 2023) (same); *Vuona*, 919 F. Supp. 2d at

374 (statistical analysis is rarely sufficient to refute a defendant's particularized evidentiary

showing of non-discriminatory explanation for challenged act).

In short, none of the factors to which Plaintiffs point, "taken singly or in combination,

provide[] any basis from which a reasonable fact-finder could infer discriminatory intent."

*Springle v. Metro. Transp. Auth.*, No. 06-CV-734, 2008 WL 331362, at *10 (S.D.N.Y. Feb. 1,

2008).  Even if Plaintiffs are correct that the selection process was slapdash or unfair, they have

nevertheless "failed to adduce any evidence that [Defendant] did not sincerely hold th[e] view"

that they were less suitable than others for the New HR Model "or that otherwise would permit a

factfinder to conclude that [Defendant's] real reason for removing [them] was [their age]."

*Pleener v. N.Y.C. Bd. of Educ.*, 311 F. App'x 479, 481 (2d Cir. 2009) (summary order). And even if Plaintiffs were unfairly evaluated as part of the 2023 Resource Action, they have "done little more than cite to [their] alleged mistreatment and ask the court to conclude that it must have been related to" their age. *Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) (*per curiam*); *see Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-8812, 2015 WL 1499618, at *42 (S.D.N.Y. Mar. 27, 2015) ("fallacy" for plaintiff to say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class"), *aff'd*, 693 F. App'x 41 (2d Cir. 2017) (summary order).

Because Plaintiffs have not provided sufficient evidence for a rational factfinder to conclude that their ages were a but-for reason for their termination, Defendant's motion for summary judgment as to Plaintiffs' ADEA disparate treatment claim is granted.

## B.   ADEA – Disparate Impact

### 1.   Exhaustion

Defendant argues that Plaintiffs failed to exhaust administrative remedies on their disparate impact claim because that claim was not included in or reasonably related to their Equal Employment Opportunity Commission ("EEOC") charge. (D's Mem. at 26.)

"Before filing an ADEA claim in federal court, a plaintiff must exhaust the available administrative remedies by filing a timely complaint with the EEOC." *Cerni v. J.P. Morgan Sec. LLC*, 208 F. Supp. 3d 533, 541 (S.D.N.Y. 2016). "In addition to claims that are expressly alleged, a timely filed EEOC charge also satisfies the exhaustion requirement for any claims that are 'reasonably related' to conduct alleged in the EEOC charge." *Rusis v. Int'l Bus. Machs. Corp.*, 529 F. Supp. 3d 178, 199 (S.D.N.Y. 2021). Claims not raised in an EEOC charge are "sufficiently related to the allegations in the charge that it would be unfair to civil rights

35

plaintiffs to bar such claims in a civil action . . . where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003). "[W]hether claims are reasonably related depends on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Martin v. Coinmach Corp.*, No. 15-CV-8137, 2016 WL 6996182, at *3 (S.D.N.Y. Nov. 29, 2016). Although in some instances "the Second Circuit has held that disparate treatment allegations are not reasonably related to disparate impact claims for purposes of exhaustion," *Cerni*, 208 F. Supp. 3d at 542, that is not always the case, *see Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 71 n.9 (2d Cir. 2015) (in appropriate case, facts in EEOC charge may encompass disparate impact claim even if plaintiff has labeled claim only disparate treatment); *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir. 1998) (disparate impact claim reasonably related to failure to promote claim); *Wright v. Stern*, 450 F. Supp. 2d 335, 369 (S.D.N.Y. 2006) (disparate impact claim reasonably related to EEOC charges also alleging intentional discrimination).

Here, Plaintiffs' charge alleges that IBM disproportionately terminated its older employees and challenges the criteria that it considered in making its selection decisions. (ECF No. 45-3 ¶¶ 2, 27-28; ECF No. 45-2 ¶¶ 2, 37-39, 45, 53-54.) Onken's charge also alleges that IBM did not use first-line managers in that process. (ECF No. 45-2 ¶¶ 44, 46.) These allegations demonstrate that Plaintiffs challenged the selection process as a whole, arguing that it affected older employees other than themselves, "even as they also alleged specific instances of discrimination against them as individuals." *Martin*, 2016 WL 6996182, at *4; *see Gordon v. City of N.Y.*, No. 14-CV-6115, 2016 WL 4618969, at *5 (S.D.N.Y. Sept. 2, 2016) (plaintiff brought disparate treatment and disparate impact claims by alleging that promotion selection

process permitted discriminatory impact on minority groups because it used subjective criteria and also that application of process to plaintiff resulted in discriminatory treatment). Based on these allegations, which are at the heart of Plaintiffs' disparate impact claim, I would expect that the EEOC, in investigating the complaint, would have assessed Defendant's selection process and its effect on older employees. *Cf. Brown*, 163 F.3d at 708, 712 (EEOC would have assessed defendant's promotion process and effect on minority employees where charge alleged defendant refused to promote plaintiff and instead promoted dozens of non-minority employees and scarcely any minorities).

To the extent that Defendant argues that the charges do not raise a disparate impact claim because Plaintiffs do not identify a specific employment practice or policy, this is an issue to be resolved on the merits rather than with respect to exhaustion. *See Walker v. Accenture PLC*, 511 F. Supp. 3d 169, 193 (D. Conn. 2020) (argument that plaintiff failed to exhaust because charge did not identify specific employment practice causing disparate impact was to be considered not with respect to exhaustion but instead on merits of claim as matter of law); *see also Martin*, 2016 WL 6996182, at *3 ("Plaintiffs were not, however, required to plead disparate impact in their EEOC complaints with the specificity required in a federal court action."). I therefore decline to dismiss on grounds of failure to exhaust.

### 2. Merits

"[D]isparate-impact claims involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another." *Doheny v. Int'l Bus. Machs., Corp.*, 714 F. Supp. 3d 342, 364 (S.D.N.Y. 2024). "Unlike disparate-treatment claims . . . , disparate-impact claims do not require proof of discriminatory

37

intent." *Id.* Disparate impact claims are analyzed under a three-part burden-shifting framework.

*See Allen*, 2025 WL 3152723, at *2.

> Plaintiffs must first make out a *prima facie* case of discrimination by identifying a specific employment practice or policy, demonstrating that a disparity exists, and establishing a causal relationship between the two. Plaintiffs bear the burden of isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities. If step one is met, the burden shifts to the employer to undermine the causal analysis or mount a business necessity defense. If the employer establishes that its actions served a business necessity, the burden shifts back to Plaintiffs to show that other non-discriminatory methods exist to meet the employer's legitimate business interest.

*Id.* Defendant contends that Plaintiffs fail to identify a specific, neutral employment policy or practice that was actually used in their selections. (D's Mem. at 19, 21-22.) Plaintiffs argue that their AC identifies the practice as the method used to make selection decisions in the 2023 Resource Action, which involved a small group of individuals using inherently subjective criteria and applying that criteria in a subjective manner. (Ps' Opp. at 19-21.) Defendant responds that that is not the employment practice articulated in Plaintiffs' AC and that Plaintiffs are impermissibly attempting to change their theory in their opposition to the motion. (D's Reply at 8.)

> In the AC, Plaintiffs alleged that

> Defendant's practice of: (1) restricting decision-making authority only to upper-level managers without soliciting input from first-line managers m[o]st familiar with the HR employees' capabilities; and (2) using inherently subjective criteria to determine who would be selected for termination in the layoff . . . had a disproportionate adverse effect on employees over the age of 40, including Plaintiffs.

(AC ¶ 155; *see also id.* ¶ 161 (alleging practice had adverse effect on employees over 50)).)

Because a plaintiff may not amend her complaint through her brief, *see Smith v. City of N.Y.*, 385

F. Supp. 3d 323, 338 (S.D.N.Y. 2019), that is the employment practice I consider here.[9]

Defendant argues that Plaintiffs did not accurately describe the selection process, as the

criteria were not subjective and first-line managers were involved. (D's Mem. at 22; D's Reply

at 8.) Although Onken's first-line manager, McDonald, was involved in the selection decisions

and provided her input on Onken's capabilities, the first-line managers for most of the eligible

HRPs, including Wimbish, did not participate in the process. (*See* ECF No. 69-23, Column L;

Gordon Depo. at 66:9-67:5.)[10] And while first-line managers for eighteen of the seventy-nine

eligible HRPs were involved, (D's 56.1 Stmt. ¶¶ 69, 76), Plaintiffs' statement in the AC could be

construed to mean that they were challenging the fact that not *all* of the eligible HRPs' first-line

managers were consulted or involved in the decisions. Thus, while it is not true that no first-line

managers participated, it is also not true that input from first-line managers was always obtained.

Further, as Plaintiffs point out, the absence of first-line managers for all eligible HRPs still could

have caused Onken injury, even though her manager was present, because there may have been

---

[9] Plaintiffs sought leave to amend their complaint to add the disparate impact claim just before the close of fact discovery, (*see* ECF No. 27 (setting fact discovery deadline for September 13, 2024); ECF No. 30 (Plaintiffs' pre-motion conference letter filed September 5, 2024)), and therefore they should have been able at that time to identify the specific employment practice they believed had a disparate impact on older workers, *cf. Walker*, 511 F. Supp. 3d at 195 (at pleading stage, plaintiff not required to set forth detailed descriptions of defendant's employment practices because information was within defendant's position and control).

[10] Defendant asserts that first-line managers for other eligible HRPs were not consulted in part because the process was highly confidential and because some of those first-line managers were being considered for termination themselves, (D's 56.1 Stmt. ¶ 70; *see* ECF No. 69-23, Column L), but possible reasons for the challenged practice are not considered at the first stage of the disparate-impact test.

insufficient information with which to compare the HRPs' performance.  (*See* Ps' Opp. at 20-21.)

Next, Defendant argues that the practice of "using inherently subjective criteria" was not actually used, because Defendant considered several objective factors, including performance reviews, Your Insights scores, and Learning Completion scores.  (D's Reply at 8.)  But Defendant also relied on the opinions of those at the assessment meeting and the decision-makers' personal experiences with the eligible HRPs, (*see, e.g.*, D's 56.1 Stmt. ¶ 81; Gordon Depo. at 114:20-115:2; McDonald Depo. at 111:11-13, 153:2-24), which are subjective considerations.  So again, while it is not true that only subjective criteria were used, it also not true that subjective criteria were not used.  And courts have found that the use of subjective criteria in employment decisions, even in combination with objective criteria, qualifies as a specific employment policy or practice.  *See Brown v. City of N.Y.*, No. 16-CV-1106, 2017 WL 1102677, at *6 (E.D.N.Y. Mar. 23, 2017) (court found plaintiff adequately pleaded specific policy or practice to support disparate impact claim where plaintiff alleged delegation of fact-specific decision-making to individuals without appropriate monitoring and guidance that permitted unchecked discretion); *Gordon*, 2016 WL 4618969, at *3, 5-6 (finding plaintiffs had sufficiently alleged specific employment practice where they alleged managers used combination of numerical evaluation score and unidentified criteria when making promotional decisions, and stating, "an employment practice that includes the opportunity for a manager to subjectively evaluate an individual can serve as the basis for a disparate impact claim"); *see also Davis v. District of Columbia*, 925 F.3d 1240, 1249 (D.C.C. 2019) ("An actionable specific employment practice might be a set of subjective criteria such as . . . firing based on a manager's subjective sense of who best to retain . . . .").  Thus, while Plaintiffs seem to have overstated the facts in

their AC, they have – giving them the benefit of every doubt – established a specific employment practice used in the 2023 Resource Action that is close enough to the one set forth in the AC:  the use of some subjective criteria and the failure to consult all first-line managers.

Defendant also argues that Plaintiffs fail to proffer legally sufficient evidence of a disparity.  Plaintiffs' expert, Dr. Steven J. Shapiro, used the Fisher's Exact Test to test the "null hypothesis" that the proportion of individuals forty and over who were terminated was identical to the proportion of those under forty.  (ECF No. 69-25 at 2.)  Dr. Shapiro found that the proportion of individuals forty and over who were laid off was higher than the proportion of those under forty who were laid off with a statistical significance of 2.7%,[11] which exceeds two standard deviations.  (*Id.*)  Dr. Shapiro also found a rejection of the null hypothesis at the 3.7% significance level using a "two sample z-score test."  (*Id.*)  He also calculated that the percentage of those under forty selected for termination divided by the percentage of those forty and over selected for termination is 46%, less than the 80% criterion used by the EEOC.  (*Id.*)[12]  Dr. Shapiro used the same tests for individuals fifty and over, and the results exceeded two standard

---

[11] Dr. Shapiro's report explains that statistical significance of 2.7% means that the probability of an error when concluding that those forty and over had a higher proportion of termination is 2.7%.  (ECF No. 69-25 at 2.)

[12] The EEOC's "four-fifths rule" provides that

> [a] selection rate for any race, sex, or ethnic group which is less than four-fifths ( $^4/_5$ ) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact.

29 C.F.R. § 1607.4(D).  "This enforcement standard has been criticized on technical grounds, and it has not provided more than a rule of thumb for the courts."  *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 995 n.3 (1988).  It is thus "not binding on courts, and is merely a 'rule of thumb' to be considered in appropriate circumstances."  *E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 118 (2d Cir. 1999).

deviations. (*Id.* at 2-3.) A disparity of two standard deviations is considered statistically significant and warrants an inference of discrimination. *See Malave v. Potter,* 320 F.3d 321, 327 (2d Cir. 2003). Dr. Shapiro's one-page analysis does not explain the Fisher's Exact or two sample z-score tests, nor does it show his work.

Defendant argues that Dr. Shapiro's conclusions do not support Plaintiffs' *prima facie* case because they are unreliable, in that he: (1) did not isolate the specific employment practices allegedly responsible for the disparities and did not account for other non-discriminatory reasons for them; (2) analyzed the wrong population; (3) misapplied the Fisher's Exact Test; and (4) used other tests that are not probative of disparate impact. (D's Mem. at 22-25.) Defendant's first argument overlaps with its argument that Plaintiffs have also failed to show causation. (*Id.* at 19-21.)

Beginning with Defendant's last point, courts have found that the four-fifths rule and the z-score test may be used to support a plaintiff's *prima facie* case. *See Easterling v. Connecticut*, 783 F. Supp. 2d 323, 332 (D. Conn. 2011) (although not binding on courts, four-fifths rule is one of two principal methods for determining whether plaintiff has presented statistical data sufficient to raise inference of causation); *United States v. City of N.Y.*, 637 F. Supp. 2d 77, 86 (E.D.N.Y. 2009) (four-fifths rule is widely recognized statistical measure of disparate impact); *Bew v. City of Chicago*, 979 F. Supp. 693, 696 (N.D. Ill. 1997) (data from z-score test supported *prima facie* case of disparate impact); *see also Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 81 n.14 (3d Cir. 2017) (evaluating reliability of expert's evidence of disparate impact where expert conducted z-score test). Even if these tests are insufficient on their own, they can support a disparate impact claim when used in conjunction with other statistical evidence. *See Jones v. Pepsi-Cola Metro. Bottling Co.*, 871 F. Supp. 305, 311 (E.D. Mich. 1994) (four-fifths rule is

recognized as rule of thumb to be used in conjunction with standard deviation or other statistical evidence).  Thus, Defendant is incorrect that, as a general matter, these tests are not probative of disparate impact.

Defendant also argues that Dr. Shapiro analyzed the wrong population because he analyzed all seventy-nine eligible HRPs together without accounting for first-level manager involvement.  (D's Mem. at 23.)  In other words, Defendant argues Dr. Shapiro should have excluded Onken and the seventeen other HRPs whose first-line managers were involved in the selection decisions, because they were not subject to the alleged employment practice Plaintiffs challenge.  (*Id.*)  Plaintiffs do not specifically address this argument, but they argue elsewhere that the practice of only including some of the eligible HRPs' direct supervisors was problematic because without all first-line managers being included, the decision-makers could not perform a comparative assessment of all eligible HRPs.  (Ps' Opp. at 20-21.)  As mentioned above, Plaintiffs' AC could be construed as challenging the practice that not *all* eligible HRPs' first-line managers were included, which impacted the selection process by hindering an accurate comparative analysis.  Because Onken and the other seventeen HRPs who had their first-line managers present were still subject to this practice, in that they were selected for termination through a process in which not all eligible HRPs' first-line managers gave feedback, Defendant's argument in this regard is not persuasive.

Next, Defendant and its expert contend that Dr. Shapiro's tests were misapplied or inapplicable, and thus do not support an inference of disparate impact.  (D's Mem. at 23-24; D's Reply at 10-11.)  While at least some of their arguments strike me as persuasive, I need not resolve those issues because I find that Dr. Shapiro's opinion, and Plaintiffs' attempt to show a *prima facie* case, has a more basic failing.  Defendant convincingly argues that Dr. Shapiro did

not account for other non-discriminatory reasons for the statistical disparities, which renders his opinion insufficient to establish a *prima facie* case of disparate impact.  (D's Mem. at 19-21; D's Reply at 9-10.)  Specifically, Defendant argues that by failing to control for variables, including the impact that Checkpoints, Learning Completion scores and Your Insights scores had on the selection outcomes, Dr. Shapiro failed to establish causation.  (D's Reply at 9-10.)  Plaintiffs argue that there was no available data or evidence of other causes that could have influenced the outcome, as there was no cause for Plaintiffs' termination other than IBM's selection process, which is what Dr. Shapiro analyzed.  (Ps' Opp. at 21-23.)

But Plaintiffs are not permitted to rely on the overall decision-making process when bringing a claim for disparate impact, *see Malave*, 320 F.3d at 327 ("[A] plaintiff generally cannot attack an overall decision making process in the disparate impact context, but must instead identify the particular element or practice within the process that causes an adverse impact."); *Smith v. Xerox Corp.*, 196 F.3d 358, 367 (2d Cir. 1999) (plaintiffs identified overall decision-making process used in reduction in force as specific employment practice, but "a plaintiff generally cannot rely on the overall decision-making process of the employer as a specific employment practice"), unless they "can demonstrate to the court that the elements of the employer's decisionmaking process are not capable of separation for analysis," *Malave*, 320 F.3d at 327.  Plaintiffs have not done so here.[13]  And Plaintiffs fail to acknowledge that the specific employment practice they identified in their AC was not the entire selection process, but

---

[13] As discussed below, although Plaintiffs argue that no data similar to that considered in *Diehl v. Xerox Corporation*, 933 F. Supp. 1157, 1167 (W.D.N.Y. 1996), or *Gallagher v. IBEW Local Union No. 43*, No. 00-CV-1161, 2008 WL 4613758, at *5 (N.D.N.Y. Oct. 15, 2008), exists here, (Ps' Opp. at 22-23), that is not so.  Further, Plaintiffs incorrectly blame Defendant for failing to identify possible nondiscriminatory variables, (Ps' Opp. at 21), when it is their burden to make out a *prima facie* case, *see Allen*, 2025 WL 3152723, at *2.

rather two specific aspects of it:  the failure to include the eligible HRPs' first-line managers and the use of subjective criteria in the assessment.  (AC ¶ 155.)[14]  Plaintiffs must show that those particular practices caused the disparity they identify, *see Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 542 (2015) ("[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."), but Dr. Shapiro made no effort to do so, (D's 56.1 Stmt. ¶¶ 138-40 (Dr. Shapiro did not analyze selection process, perform any test relating to causation or reach any opinion about what caused the disparate impact he identified)).  Further, although they challenge the use of subjective criteria, Plaintiffs' analysis did not account for the use of objective criteria – including the Checkpoint reviews, Learning Completion scores, and Your Insights scores – in the selection decisions.  By failing to isolate the specific aspects of the selection process that Plaintiffs challenge, Dr. Shapiro failed to analyze the impact of a specific employment practice upon Plaintiffs, which "is alone a sufficient basis upon which to find that plaintiffs have failed to establish a *prima facie* case of discrimination."  *Diehl*, 933 F. Supp. at 1167.

Plaintiffs did not challenge Defendant's use of objective measures,[15] and Dr. Shapiro could have controlled for these variables by assessing the impact of the Learning Completion or Your Insights scores or the Checkpoint reviews by, for example, isolating in a regression those

---

[14] In their brief Plaintiffs complain of various other aspects of the selection process – for example, Plaintiffs note that the process did not account for "job band, job duties or managerial status" and did not include a "skill-by-skill assessment," (Ps' Opp. at 21) – but those elements are not part of the challenged practice.

[15] Indeed, it seems Plaintiffs would have wanted Defendant to rely solely on such criteria. (*See* Ps' Opp. at 21 (noting there was no ranking of the checkpoint performance ratings); Ps' 56.1 Resp. ¶ 118 (noting younger employees with lower skills ratings than Plaintiffs).)

HRPs who had received a rating of "Growth Opportunity" (IBM's euphemism for below expectations) in their assessments. "Although multiple regression analysis is not a prerequisite for the admission of statistical reports in discrimination cases, courts have repeatedly held that statistical analyses that fail to control for *any* nondiscriminatory explanations are inadmissible." *E.E.O.C. v. Bloomberg L.P.*, No. 07-CV-8383, 2010 WL 3466370, at *9 (S.D.N.Y. Aug. 31, 2010) (emphasis in original);[16] *see Tex. Dep't of Hous. & Cmty. Affs.*, 576 U.S. at 542 (discrepancy, without more, does not establish *prima facie* case of disparate impact).

This case is unlike those in which it made little sense for an expert to account for certain variables, and thus the failure to do so could be excused. For example, in *Equal Employment Opportunity Commission v. Venator Group*, the Court found the expert did not have to account for numerical rankings that were created as part of a layoff decision because the plaintiff alleged that the ranking process itself was tainted by age discrimination. *See* No. 99-CV-4758, 2002 WL 181711, at *3 (S.D.N.Y. Feb. 5, 2002); *see Schanzer*, 120 F. Supp. 2d at 205-06 (expert did not need to account for data utilized in selection process where plaintiffs alleged that data was discriminatory in itself, as "tainted variables do not further the causation inquiry"). But Plaintiffs do not argue that the Learning Completion or Your Insights scores, or the Checkpoint reviews, were tainted. (*See, e.g.*, Onken Depo. at 287:4-8, 288:13-17.) And this is also not a case in which the information needed to conduct the proper regression was completely controlled by Defendant, such that Plaintiffs' expert could not have accounted for these other possible causes. *See Hogan v. Gen. Elec. Co.*, 109 F. Supp. 2d 99, 103 (N.D.N.Y. 2000) (excusing statistical expert's failure to control for other possible causes for disparity such as performance, skills, and

---

[16] A multiple regression analysis "tests a variety of factors simultaneously to determine their effect on the employment decision." *Schanzer v. United Techs. Corp.*, 120 F. Supp. 2d 200, 205 (D. Conn. 2000).

length of service because defendants prevented consideration of those factors by failing to turn over performance evaluations in discovery).  Plaintiffs could have provided the eligible HRPs' performance evaluations, Learning Completion scores and Your Insights scores to Dr. Shapiro, and it appears that Dr. Shapiro had but did not account for at least some, if not all, of that information.  (ECF No. 69-25 at 4 (Dr. Shapiro reviewed "Employee files," "Spreadsheet containing HR employee performance evaluations," and "Spreadsheet containing individuals assessed during February 23, 2023 HRP Assessment Meeting").)  Where an expert concludes that disparities could not have been caused by chance but does not conduct further statistical tests to determine what other factors could have accounted for those disparities or to rule out factors other than a plaintiff's protected characteristics, that testimony is "fatally flawed."  *Diehl*, 933 F. Supp. at 1167-68.

Dr. Shapiro's failure to account for these possible non-discriminatory reasons undermines his conclusions such that they are not probative of discrimination.  *See Hogan*, 109 F. Supp. 2d at 102 ("[A] statistical report cannot arrive at a conclusion without accounting for other possible causes.  Statistical evidence that omits the major variables is not probative."); *Wado v. Xerox Corp.*, 991 F. Supp. 174, 184 (W.D.N.Y. 1998) (finding it "highly significant" that expert failed to account for possible non-discriminatory reasons for disparities, including employees' performance and skills ratings), *aff'd sub nom.*, *Smith v. Xerox Corp.*, 196 F.3d 358 (2d Cir. 1999); *cf. Schanzer*, 120 F. Supp. 2d at 207 (although multiple regression analysis not mandated in every case, analysis that tested relationship between most recent performance ratings, ages, and whether employee was selected for layoff made report reliable).  And courts have held that plaintiffs failed to make out a *prima facie* case on their disparate impact claims where their expert reports had similar flaws.  *See Wado*, 991 F. Supp. at 184-86; *Diehl*, 933 F. Supp. at 1167-

47

69; *see also Gallagher*, 2008 WL 4613758, at *5 (failure to identify cause of correlation between age and hours worked rendered conclusions insufficient to establish *prima facie* case for age discrimination).

Accordingly, Plaintiffs' expert report fails to establish causation, and in the absence of any other evidence from which a rational jury could find causation, Plaintiffs have failed to establish a *prima facie* case of disparate impact. Therefore, Defendant is entitled to summary judgment on Plaintiffs' disparate impact claim.

### C.    NYSHRL Claims

Defendant argues Wimbish's NYSHRL claims should be dismissed for the same reasons as her claims under the ADEA. (D's Mem. at 8, 27.) The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Having determined that the only claims over which this Court has original jurisdiction should be dismissed, and having considered the factors set forth in *Cohill*, I decline to exercise supplemental jurisdiction over Plaintiffs' remaining state-law causes of action under the NYSHRL. *See id*. (citing 28 U.S.C. § 1367(c)(3)). Accordingly, Wimbish's state law claims are dismissed without prejudice.[17]

---

[17] Plaintiff Onken also brought a claim for intentional discrimination under the AFPEA. (AC ¶¶ 148-152.) Defendant argued that it was entitled to summary judgment on that claim, (*see* D's Mem. at 18), but Plaintiffs did not address that argument in their opposition brief. Accordingly, Plaintiffs have abandoned Onken's AFPEA claim, and it is dismissed. *See Brown v. S. Shore Univ. Hosp.*, 762 F. Supp. 3d 191, 205 (E.D.N.Y. 2025) (dismissing claim with prejudice where plaintiff's brief failed to address defendants' arguments for dismissal); *Collins v. City of N.Y.*, 295 F. Supp. 3d 350, 361-62 (S.D.N.Y. 2018) (dismissing several claims as abandoned where defendants moved for summary judgment on all claims but plaintiffs failed to

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The federal claims and Onken's city claim are dismissed with prejudice.  Wimbish's state claims are dismissed without prejudice.  The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 67), enter judgment for Defendant, and close the case.  The Clerk shall seal this Opinion.  The Court will docket a redacted version and will send the unredacted version to the parties by email.

**SO ORDERED.**

Dated:  May 27, 2026
       White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

respond to defendants' arguments), *reconsideration denied*, No. 14-CV-8815, 2019 WL 1413999 (S.D.N.Y. Mar. 29, 2019); *Avola v. La.-Pac. Corp.*, 991 F. Supp. 2d 381, 390 (E.D.N.Y. 2013) ("Plaintiffs' failure to acknowledge, let alone address, [a claim] in opposing the [m]otion signals abandonment of th[at] claim[].") (collecting cases); *Taylor v. City of N.Y.*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."), *order clarified*, No. 01-CV-5750, 2003 WL 21781941 (E.D.N.Y. July 29, 2003).